No. 26,963.

R. L. FUNK, as Guardian of MARGARET A. FISH, an Incompetent, *Appellee,* v. ROBERT S. FISH, *Appellant.*

SYLLABUS BY THE COURT.

1. EVIDENCE—*Opinion—Mental Capacity to Make Deed—Discretion of Court.* In an action to set aside a deed for want of capacity it is competent for a nonexpert witness to give an opinion that the grantor, with whom he has had a considerable acquaintance, did not at the time of its execution have capacity to transact ordinary business. The trial court has a wide discretion in admitting or rejecting such testimony, and it is not essential that the witness shall state all the observed facts on which his opinion is based, particularly where full opportunity for cross-examination is given.

2. INSANE PERSONS — *Incapacity to Make Deed — Evidence.* The evidence is held to support a finding of want of capacity to execute a deed, and also of its execution having been induced by undue influence.

3. APPEAL AND ERROR—*Right of Review.* Rulings excluding evidence are held not reviewable, because no showing was made as to what it would have been.

Appeal from Brown district court; C. W. RYAN, judge. Opinion filed January 8, 1927. Affirmed.

*Bennett R. Wheeler, S. M. Brewster, John L. Hunt,* all of Topeka, and *Paul B. Bailey,* of Hiawatha, for the appellant.

*W. F. Means* and *W. E. Archer,* both of Hiawatha, for the appellee.

The opinion of the court was delivered by

MASON, J.: William A. Fish died testate May 7, 1919, leaving to his wife substantially all his property, which included 560 acres of Brown county land. Besides his wife, he was survived by two daughters, two sons (Robert S. and Pearl) and two grandchildren—children of his deceased son. His wife was named executrix and qualified and acted. On January 23, 1924, the probate court found Mrs. Fish to be incompetent and incapable of managing her affairs, and appointed R. L. Funk her guardian. On October 18, 1924, the guardian brought this action against Robert S. Fish to set aside a deed (reserving a life interest) covering the home place, a quarter section, executed by her to her son on May 13, 1920, because of want of capacity and undue influence. The district court found in favor of the

Appeal and Error, 3 C. J. p. 825 n. 53. Deeds, 18 C. J. pp. 443 n. 19, 445 n. 34. Evidence, 22 C. J. pp. 599 n. 42, 601 n. 67, 609 n. 39; 36 L. R. A. 68, 70; 11 R. C. L. 604.

Funk v. Fish.

plaintiff on both grounds and a judgment was rendered accordingly, from which the defendant appeals, relying chiefly upon the contention that there was no substantial competent evidence to support either finding.

1. Objection is made to the competency of the testimony of two witnesses. One was a banker, the other a doctor.

The questions asked of the banker, and his answers, were:

"I think this is probably repetition, but you may state what is your opinion as to her mental condition as being able to transact her business gathered from your conversations with her, the transaction of her business for her and your communications with her as to whether she was competent or incompetent.

"In my opinion, well, she could not have possibly taken care of it without help. I do not think she was in any condition to discharge the duties properly.

"From what you saw and observed during the time she was transacting business at your banks, as you testified to, what did you observe as to her capacity to transact business?

"I would say she could not have transacted the business. She was utterly incompetent to transact business."

In the case of the doctor the question and answer objected to were:

"From your acquaintance with Mrs. Fish at the time and before her husband's death, and from your observation made of her at that time and since, and from the information you have obtained relative to the transaction of her business, and from the state of her business and accounts, what would be your opinion as to her capacity to transact her business and know and understand fully her business transaction?

"I think she is incompetent."

The competency of the testimony is challenged on these grounds:

(a)   The rule that nonexpert witnesses may give their opinions as to whether a person is sane or insane does not extend to a question of capacity to transact business.

(b)   A witness should not be allowed to give his opinion as to a person's capacity to make a deed or to transact business, because it involves his passing upon the question of law as to how much capacity is required for those acts.

(c)   The witnesses should not have been permitted to give their opinions without stating the observed facts on which they were based.

(d)   In the case of the doctor, his testimony related to Mrs. Fish's condition at the time of the trial and not when the deed was executed.

We think none of these objections is well founded. In support of the first proposition the defendant cites this text:

"Opinion as to *sanity* and opinion as to general testamentary or criminal *capacity* are entirely distinct. The latter sort of opinion is inadmissible (when it is) because a question of law may be involved, and witnesses' conclusions are not needed on such points. Rulings excluding such opinions *(post,* § 1958) may well coexist with rulings receiving opinions as to sanity." (4 Wigmore on Evidence, § 1937.)

This quotation obviously does not deal with a distinction between expert and nonexpert witnesses, but with that between on the one hand insanity, which is treated as a somewhat definite state of mind, and on the other capacity to do a particular act, which depends upon the degree of intelligence the law declares necessary for that purpose. This is clearly shown by the following paragraph from the same work:

"The peculiar practical difference, it may be noted, between the present application of the opinion rule [*i. e.,* to capacity to transact business or do other specific acts] and its applications to the topic of sanity *(ante,* § 1938) is of course that here even an expert, medical or legal, may not speak so as to employ a legal definition, while there it is conceded that a medical expert may always give an opinion on sanity." (4 Wigmore on Evidence, § 1958, p. 178.)

The admissibility of opinions of laymen concerning capacity to do business is governed by the same considerations as where sanity is the issue, and is given like treatment. See 22 C. J. 599-600, especially note 42 citing indiscriminately cases of both character. The real problem in this connection is not whether a layman may testify to a person's capacity to make a deed or transact business, but whether even a medical expert may do so. The solution of this problem involves the question of the soundness of the second objection. The writer already quoted says:

"It is easy to see that on principle the opinion of no witness whatever is needed to tell the court whether *testamentary capacity* existed, because that is a matter of applying a legal definition to the data of the testator's mental condition, and the judge (in theory) needs no assistance on that point, even from a legal witness. The data of the mental condition are to be presented, and the jury, under the judge's instructions, are to apply the definition to them. . . . But a difficulty arises. It is desirable to obtain from witness a compact statement of the general mental condition of the testator. It is, for instance, a better index of the witness' results of observation to say, 'I would or would not trust him to buy property intelligently,' than merely to say, 'He once did this or that wise or foolish act.' The general statement often conveys a more accurate understanding of his condition than a rehearsal of many single acts— acts which indeed are in detail largely forgotten, cannot be reproduced in statement, and have left only the general impression. Such a general statement is perfectly legitimate; but the difficulty lies in distinguishing it from a statement

Funk v. Fish.

involving the use of some legal definition of testamentary capacity. The ordinary witness, though using a compendious statement, may really have no desire to attempt a legal definition and may be thinking only of the deceased's general capacity to take care of himself and his property. Nevertheless, in distinguishing between the proper and improper forms of statement, an easy opportunity is offered for judicial quibbling. In the dilemma thus presented, the solution seems often to depend merely on whether the court is disposed to stick at trifles and the forms of things, or to follow practical good sense. . . . By all courts a mere abstract statement that the person was or was not 'capable' of making a will or a contract or a deed seems to be held improper; but there is great contrariety of ruling upon other forms of statement." (4 Wigmore on Evidence, § 1958, pp. 174-175.)

In the note to the last text quoted are cited many instances in which the question whether the witness thought the person in question to have capacity to transact ordinary business (or that in effect) has been held admissible, and some where a contrary ruling was made, the author often making brief memoranda by way of comment upon the decisions. For illustration, in one instance the question and its decision are thus indicated: "whether the grantor was capable of making a deed of real estate; the former held clearly allowable, and the latter also on the facts, good opinion." In another: "excluding 'capacity to dispose by will or deed,' but admitting 'capacity to transact business.'" In another (*In re Betts' Estate*, 113 Ia. 111): "whether the testator was 'capable of transacting business intelligently,' excluded; such a ruling seems to render witnesses incapable of giving testimony intelligently." In another: "whether the testator was capable of making the will, excluded; whether he was 'capable of transacting ordinary business and of intelligently disposing of property' allowed; *In re Betts' Estate*, supra, said to have been 'practically overruled.'" In another: "opinion as to being 'in a condition to transact business or make a contract,' excluded; unsound." The witnesses in most of the cases cited in this note were nonexperts. In several instances it is indicated that the witness was a doctor, and the inference would seem to be that in all the other cases a layman was testifying. See, also, 22 C. J. p. 601, note 67, and p. 602, note 74.

With respect to the third objection there is apparently no greater reason for making a distinction as to the requirement for a witness stating the facts on which he founds his opinion where the question is one of capacity to do a particular act than where it is one of insanity. There is some want of harmony in the decisions, but this court has said:

"The incidents detailed by the witnesses may not in themselves have justified a conclusion that the defendant was insane. But that was not necessary in order to render the evidence admissible. One of the cogent reasons for allowing a witness to give his opinion as to the sanity of the person the condition of whose mind is under investigation is that he cannot possibly place before the jury every circumstance that has influenced his judgment in the matter." *(State v. Rumble,* 81 Kan. 16, 18, 105 Pac. 1.)

Of the general state of the law on the subject Dean Wigmore says:

"It has been already noticed *(ante,* § § 1917, 1922) that the general rule, in a few courts, requires that a statement of the facts *(or observed data)* must precede the witness' statement of his opinion or conclusion; and that this on principle is an unsound limitation. Now the chief field for the application of this misconceived requirement has been the present topic [opinion evidence as to sanity]; and in a number of jurisdictions the courts are found requiring that 'the facts,' *i. e.,* observed data, 'must accompany (or precede) the opinion.' This requirement in some of the remaining jurisdictions has been expressly negatived; in the others it does not exist in practice, but has not been expressly passed upon." (4 Wigmore on Evidence, § 1935.)

Another text reads:

"The inference of an ordinary observer as to the mental condition of a designated person may be received, for the reason that it is usually impossible, as a practical matter, to present to the jury a detailed statement of the constituent facts or matters of appearance on which the inference is based, with such degree of completeness or accuracy as to enable them to draw a proper inference." (22 C. J. 599.)

Regarding the fourth objection—the answer of the witness in his examination in chief was given in words already quoted, but a previous inquiry tended to show he meant it to apply to the date the deed was executed. Moreover, on cross-examination he was asked, "You say in your opinion she was incapable of doing business on the 13th of May, 1920?" and answered, "I would think so."

The doctor had practiced medicine twenty-three years and had known Mrs. Fish for that time. The banker had known her from three or four years before her husband's death. Full opportunity for cross-examination was given.

In speaking of evidence being admissible as bearing on the issue of capacity to make the deed we mean that it was competent for the court to admit it in the exercise of his discretion, or to speak more accurately, of his sound judgment. The trial judge is often in a better position than an appellate court to determine whether a sufficient foundation has been laid and whether the testimony offered has substantial probative force. (22 C. J. 609.)

2. The holding that the testimony already discussed was competent goes far to determine also that the evidence was sufficient to support the judgment. There was other evidence of a like character. The evidence therefore warranted a finding that at the time the deed was executed Mrs. Fish had not capacity to transact ordinary business. And regarding that fact as established there was room for the court to conclude also that she was not capable of making an effective deed. There was further evidence to this effect:

Mrs. Fish said to the tenant of the quarter conveyed "I cannot let you have it any longer. I have to let Bob have it to keep peace." She was worried after her husband's death. "She was forgetful and would tell things several times. She would be talking about one thing and before she would get through with it, would tell the same thing over again." In February, 1920, her son Robert, who had been living in Coffey county, came to live with her, staying until March, 1921. She told a daughter-in-law that she was giving each of her sons a quarter section and expected to give the children all the same, saying there was plenty to give them all the same—"They will all share and share alike." The daughter-in-law said: " 'Why, Grandma, how can you? When you have given away the two best quarters' and she said she had bonds, other land, two houses and lots to divide." The quarter deeded to Robert was worth $45,000. Two hundred and forty acres deeded to the other son which he later reconveyed was worth $46,000 to $52,000. A quarter still held by Mrs. Fish was worth $18,000 to $20,000. Other realty named by the guardian was estimated by him at $5,500. When the deeds referred to had been made there was not enough land left to give each an equal share. She told a daughter there would be just the same for each of them; that Robert wanted the land deeded to him and she would have to give it to him; that she had given it to him; that she would have to let him have it to keep the peace. She told Pearl that Bob had asked her to deed him the quarter. After the deed was executed Mrs. Fish told people she still owned the land.

Mrs. Fish was a witness and her testimony included the following:

"What was the first thing that was said by you or by Robert to you relative to your making a deed to this quarter section?

"He came in there, I think it was early in the morning. I was sweeping the kitchen. He came and spoke and said, 'Mother, will you make me a deed to that home place.' He said, 'Pa gave it to me.' I said, 'if he gave it to you I reckon I can.' That is the words I said to him.

"How long was that before you did make the deed?

"I do not know how long it was. It was not very long until we made the deed. I do not remember just how long it was.

"What if anything did he say to you about going up and making a deed?

"I think he said we would go up in a short time. I think he did say something about going up."

The concluding findings made by the court, to which the defendant objected as not supported by the evidence, read:

"Margaret A. Fish, when discussing her said alleged conveyances to her sons, Pearl and Robert, repeatedly, said that she was going to treat all the children alike in the division of her property. When Mr. Moser, the township assessor called upon her to give a statement of her property for taxation she told him there was some property, but she did not know what it was and he would have to see Pearl. Mrs. Fish was greatly grieved over the loss of her husband. She frequently talked and cried about it. It preyed upon her mind. One of her weaknesses was a desire to manage her affairs as she thought her husband would do if living. The defendant took advantage of this when he requested her to make a deed for the home place and told her that 'pa had given it to him.'

"Mr. Schmitt, her son-in-law, was farming the home place and had been for some time. After the death of her husband Mrs. Fish informed her son-in-law that he could have the place for three years, but after the defendant moved in with his mother, as above stated, Mrs. Fish informed Schmitt that he would have to move off and said that she had to let Bob have the farm to keep peace. From the time of her husband's death up to the time of the appointment of the guardian Mrs. Fish did very little, if anything, in the actual management and care of her property.

"At the time of the alleged conveyance said Robert S. Fish was 57 years of age and resided with her. A few days before the execution of the alleged deed he went to the kitchen where his mother was sweeping and said to his mother, 'Will you make me a deed to that home place? Pa gave it to me.' She replied 'If he gave it to you, I reckon I can.' A few days after this conversation took place and while still residing with her he took her to the register of deeds office in Hiawatha; Pearl went along. Miss Ham, a notary public, was in the office and drew the deed. When she inquired about the numbers of the land, Robert, the defendant, gave her the numbers from memory. Miss Ham verified the numbers from a map in the office. The alleged deed was executed under such circumstances without the knowledge or consent of Mrs. Hinkle or Mrs. Schmitt, daughters of Mrs. Fish, or her said grandchildren.

"Mrs. Fish at the time of the execution of the deed in question, was 73 years old, infirm, enfeebled in mind and memory, inexperienced in business affairs, could not write a check, had little knowledge of farm values, or the value of personal property, or of the extent and value of her own property. She was dependent upon others for the management of her affairs, was an incompetent and distracted person, incapable of managing her affairs.

"The defendant procured the execution of the deed in question through undue influence exercised by him over his mother and by reason of her incapacity and incompetency as stated."

There was testimony contradicting much of the evidence already summarized, and tending to show Mrs. Fish to have had capacity to make the deed. The issue, however, was one of fact, and the finding of the district court in that respect must stand. Want of capacity being established, a less degree of proof was required upon the issue of undue influence than would otherwise have been necessary, and we regard the finding in that respect as also supported. Of the effect of the one finding upon the other it has been said:

"It was shown that while Conrad Schuster was in a weak and unsound mental condition he made these deeds conveying all of his property to his two sons-in-law, without any consideration whatever therefor. This was sufficient evidence to be considered by the court upon the issue presented by the petition. In the nature of things it would be a rare case where the details of conversation or conduct could be shown indicating undue persuasion and influence. Such arts would be exercised only in the absence of witnesses, or, at most, in the presence of those whose interest and inclination would impel to their denial. We may as well judge of the cause from an effect as of the effect from a cause. The fact that one mentally infirm does these things might of itself lead to the fair and just conclusion that he was impelled thereto by undue persuasion and influence, and this fact, being proved, is sufficient to sustain the allegation of the petition." (*Howard v. Carter,* 71 Kan. 85, 92, 80 Pac. 61.)

3. Two of the defendant's witnesses who were shown to have known Mrs. Fish for some years were asked to state their opinions as to whether she was sane or insane. Objections to the questions were sustained, and of this complaint is made. No reason for rejecting the evidence is apparent, but as no verified showing was made of what answers would have been returned the ruling is not open to review. (R. S. 60-3004.) One of the witnesses had already testified that he had never observed anything about Mrs. Fish's mental condition that he knew of—that she always seemed natural, clear through her life. This might warrant the presumption that if permitted he would have answered that he thought her sane, but the very fact of his having given this testimony shows that no prejudice could have resulted from excluding his answer. There is nothing to indicate what the answer of the other witness would have been. Moreover, while his acquaintance with Mrs. Fish was extensive enough to qualify him to testify as to her mental condition, it was not sufficiently intimate to make the exclusion of his testimony of much importance.

The judgment is affirmed.