The State v. Rumble.

THE STATE OF KANSAS, *Appellee,* v. CHARLES RUMBLE, *Appellant.*

No. 15,797.

SYLLABUS BY THE COURT.

1. EVIDENCE—*Opinion—Insanity.*   Although the trial court has some discretion in determining whether a non-expert witness has had sufficient opportunity of observation to render admissible his opinion of the mental condition of one whose sanity is in issue, it is error to refuse to allow him to state it, where it is shown to be based upon a fairly intimate acquaintance with the subject of the inquiry extending over several years.

2. ———— *Same.*   It is error to exclude such opinion of a witness upon the ground that a number of instances of peculiar and unusual conduct on the part of the subject of the inquiry to which he has testified do not in themselves justify an inference of insanity.

3. HOMICIDE—*Intoxication of Defendant—Reduction of Offense.*   Drunkenness may reduce a homicide from murder to manslaughter if it is so extreme as to prevent the existence of an intention to kill.

4. ———— *Intoxication of Defendant — Exoneration.*   That drunkenness may have rendered one charged with a crime incapable of knowing the nature and quality of his act, or of distinguishing between right and wrong, does not constitute a defense.

Appeal from Wyandotte court of common pleas; WILLIAM G. HOLT, judge. Opinion filed November 6, 1909. Reversed.

*Daniel J. Maher*, and *Jacob S. Detwiler*, for the appellant.

*Joseph Taggart*, county attorney, for the appellee.

The opinion of the court was delivered by

MASON, J.: Charles Rumble was convicted of murder in the second degree and appeals. It was admitted that he shot and killed, without any provocation or apparent cause, a man who so far as the evidence shows was a total stranger. The theory of the defense was that he was insane. The state maintained that he was merely intoxicated. The most important assignments of error relate to the exclusion of evidence bearing upon the question of his sanity and to the instructions given and refused regarding the effect of drunkenness.

Witnesses were produced in behalf of the defendant who testified in effect that they had known him for several years and had had opportunity to observe his usual conduct; that they had noticed at different times peculiar and eccentric actions on his part, which they described in detail. They were then asked whether in their judgment he was sane or insane. Objections were sustained to all questions of this character. Ordinarily the rejection of such evidence is reversible error. (*The State v. Beuerman*, 59 Kan. 586.) The state contends, however, that the testimony here excluded was objectionable or immaterial for some or all of these reasons: (1) It did not specifically refer to the condition of the defendant at the time of the homicide; (2) the witnesses said that the defendant bore a good reputation as a quiet and peaceable citizen, and this was inconsistent with the theory of insanity; (3) the witnesses were not shown to have had sufficient opportunity of observation to render their opinions of any value; (4)

2—81 KAN.

the facts detailed by the witnesses had no tendency to justify a belief that the defendant was insane. Of these propositions it may be said in order:

(1) The evidence rejected did not specifically relate to the precise time of the homicide, but this was not necessary, for the defense was obviously based on the theory that some form of mental derangement had existed for a considerable period. (2) A good general reputation was not necessarily incompatible with unsoundness of mind, manifested at intervals. (3) One of the witnesses had known the defendant more than six years, and had lived near him for over four years— not immediately prior to the homicide, however. Another had known him for nine years and had worked with him at different times—once for two months eight years before the trial, and once for an unstated period within a year. This court has said that "whether there is a fair basis for an opinion by a witness must be left largely to the trial court." (*Kempf v. Koppa,* 74 Kan. 153, 155.) But clearly the acquaintance of each of these two witnesses with the defendant was sufficiently intimate for the formation of a judgment as to his mental condition. As was said in the same case:

"The courts do not undertake to lay down a definite rule as to how closely the witness must have observed the person whose sanity is the subject of inquiry in order to be qualified as a witness, as even a casual observer may discover mental manifestations that would make his testimony valuable." (Page 155.)

(4) The incidents detailed by the witnesses may not in themselves have justified a conclusion that the defendant was insane. But that was not necessary in order to render the evidence admissible. One of the cogent reasons for allowing a witness to give his opinion as to the sanity of the person the condition of whose mind is under investigation is that he can not possibly place before the jury every circumstance that has influenced his judgment in the matter. As was said in *Zirkle v. Leonard,* 61 Kan. 636:

"If all the facts on which the opinion is based could be

placed before the jury, the latter could judge of the sanity or insanity as well as the witness, but there are certain indicia of mental disorder which are indescribable. Peculiar conduct, acts and deportment of the person may create a fixed and reliable judgment in the mind of an observer which could not be conveyed in words to the jury. A person may appear to be sad, dejected, sick, or well, yet such appearance could not be described satisfactorily, and hence a conclusion is permitted to be given." (Page 637.)

This court has never decided that a lay witness who has had opportunity to observe the conduct of a person whose sanity is called in question may not give an opinion upon the matter without first stating in detail the facts that have been observed, although this has sometimes been assumed in a general statement of the rule. (*Baughman v. Baughman,* 32 Kan. 538, 543; *The State v. Beuerman,* 59 Kan. 586, 589.) A more accurate expression was formulated in *Howard v. Carter,* 71 Kan. 85, in these words:

"It is well settled in this state that a non-expert witness may be permitted to give his judgment as to the sane or insane state of another's mind after having detailed to the jury the extent of his opportunities to deduce a correct opinion and judgment thereon." (Page 91.)

(See, also, *Grimshaw v. Kent,* 67 Kan. 463.)

A belief that a person is of sound mind could hardly be said to be founded upon any number of specific acts. Where an opinion has been formed that a person is insane and testimony to that effect is offered it is important that any instances of unusual conduct shall be stated, not necessarily to render the witness competent, but to aid the jury in placing a just value upon his conclusions.

"A statement of facts detailed by the witness tends to affect the weight to be given to his opinion, affording the court or jury opportunity to judge of his intimacy with the person about whom he is testifying, his facilities for observation, and the acuteness with which he has discerned peculiarities which might escape the notice of others." (*Zirkle v. Leonard,* 61 Kan. 636, 638.)

In *Commercial Travelers v. Barnes*, 75 Kan. 720, the rule was thus stated:

"Non-expert witnesses shown to have had especial opportunities of observation are allowed to give opinion evidence of the mental condition of one under investigation in this respect, having first stated the facts upon which such opinions are based, or without stating such facts when opportunity is given to cross-examine in reference thereto." (Syllabus.)

This is in accordance with the weight of authority and the better reason. (See 3 Wig. Ev. §§ 1933, 1935, 1938, 1922.)

A physician who had examined the defendant a few months after the shooting was asked to testify concerning his mental condition, but was not permitted to do so. The ground of this ruling is not clear, but in the brief of the state it is suggested that the question was too indefinite as to time. It seemed to relate, however, to the time of the examination, and on that theory was pertinent. (*The State v. Newman*, 57 Kan. 705; 16 A. & E. Encycl. of L. 614.)

The question of the defendant's guilt turned solely on whether he was insane. Inasmuch as he was not allowed to try to establish his insanity by the testimony of non-expert acquaintances—one of the well-recognized means of proving such a fact—it can not be said that he was given a fair opportunity to prove himself innocent.

The trial court took the view that to whatever extent the defendant may have been intoxicated he was guilty of murder in either the first or the second degree, or was innocent; that his voluntary drunkenness might prevent his act from being first-degree murder by rendering him incapable of deliberation and premeditation, but could not upon a similar principle prevent it from being murder in the second degree. This was evidenced by an instruction reading as follows:

"If you find that the defendant committed the act of killing as charged in the information, and that at the time he did so he was in a state of intoxication, caused

by his voluntary action, he is guilty of murder in the first degree; unless you further find that such intoxication was so extreme as to prevent his mind from the exercise of deliberation and premeditation, in which latter case he would be guilty of murder in the second degree."

Drunkenness, if so extreme as to make the existence of a definite purpose impossible, may be a defense to any crime of which a specific design is an essential element.

"To regard the fact of intoxication as meriting consideration in such a case is not to hold that drunkenness will excuse crime, but to inquire whether the very crime which the law defines has been in point of fact committed." (17 A. & E. Encycl. of L. 407.)

If a person is too drunk to form an intent to kill he can not be guilty of any offense for the commission of which such intent is necessary. (*The State v. White,* 14 Kan. 538.) At common law murder may be committed without any actual design to take life (21 Cyc. 712), and therefore drunkenness can be no defense to that charge. (12 Cyc. 174, note 77.) Under some statutes which divide murder into degrees an involuntary homicide may be murder in the second degree. (12 Cyc. 174, note 78.) In *Craft v. The State of Kansas,* 3 Kan. 450, 482, it was inaccurately said that to constitute murder at common law an intention to take life must precede the killing, and that whatever act would have been murder at common law is murder under the Kansas statute, being classified as first or second degree according to whether or not it was done deliberately and with premeditation. But in *The State v. Young,* 55 Kan. 349, 355, it was held, following the Ohio decisions, that the use of the word "purposely" in defining second-degree murder implies the existence of an intention to cause death. And this is the interpretation elsewhere placed upon that language. (21 Cyc. 712, note 50.) It necessarily follows that drunkenness so extreme as to prevent the forming of a purpose to kill might under our statute reduce what would have

been murder at the common law to manslaughter, and in a proper case instructions to that effect should be given. (See cases cited in subdivision 5 of note in 36 L. R. A. 470, under subhead "Intent," and 12 Cyc. 172.) It is to be borne in mind, however, that "the fact of intoxication, no matter how complete and overpowering, is not conclusive evidence of the absence of an intent to take life" (*The State v. White,* 14 Kan. 538, syllabus), and, as said in *Zibold v. Reneer,* 73 Kan. 312, "for a person to be too drunk to entertain an intent to kill it would seem that he would have to be too drunk to entertain an intent to shoot." (Page 320.)

The court also gave this instruction:

"If the defendant shot said Frank J. Emery, as charged in the information, and at the time of said shooting he was intoxicated, the mere fact that he may have been intoxicated at said time furnishes no excuse for the killing of said Frank J. Emery, unless his intoxication was of such a degree that he was incapable of knowing the nature and quality of the act of shooting said Emery, or of distinguishing between right and wrong."

This was too favorable to the defendant.

"It can make no difference, where no specific intent is necessary, that the defendant was so drunk as to have no capacity to distinguish between right and wrong." (12 Cyc. 172.)

"Mental incapacity produced by voluntary intoxication, existing only temporarily at the time of the criminal offense, is no excuse therefor, or defense to a prosecution therefor. . . . The test of insanity as affecting criminal responsibility, that the accused must have labored under such a defect of reason as not to know the nature or quality of the act, or, if he did know it, that he did not know he was doing wrong, does not apply to drunkenness." (36 L. R. A. 466, note.)

"Temporary insanity immediately produced by intoxication does not destroy responsibility for crime where the accused, when sane and responsible, voluntarily made himself drunk. To constitute insanity caused by intoxication a defense to an indictment for

murder it must be a settled insanity, and not a mere temporary mental condition." (17 A. & E. Encycl. of L. 405.)

The county attorney submits that the homicide could not constitute manslaughter, because in any view of the evidence the facts did not bring it within any of the statutory definitions. No reason, however, is apparent why an instruction might not properly have been given under section 12 of the crimes act. (*The State v. Spendlove,* 47 Kan. 160.) The objection made to the applicability of sections 18 (Gen. Stat. 1901, § 2003) and 26 (Gen. Stat. 1901, § 2011) is that they involve the element of "heat of passion." That term, however, has a wide range of meaning. Section 27 (Gen. Stat. 1901, § 2012) includes any inexcusable and unjustifiable killing of a human being, not otherwise classified by the statute, that at common law would have constituted manslaughter.

It is not thought necessary to consider other assignments of error, as the questions to which they relate are unlikely to arise again.

The judgment is reversed and a new trial ordered.