No. 45,788

STATE OF KANSAS, *Appellee*, v. ROY HARDEN, *Appellant*.

(480 P. 2d 53)

Opinion filed January 23, 1971.

*Ray Hodge,* of Wichita, argued the cause and was on the brief for the appellant.

*James W. Wilson,* Assistant County Attorney, argued the cause, and *Kent Frizzell,* Attorney General, *Keith Sanborn,* County Attorney, and *James Z. Hernandez,* Deputy County Attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is a criminal action wherein the defendant was charged with the first degree murder of his wife pursuant to K. S. A. 21-401. He was convicted by a jury of second degree murder pursuant to K. S. A. 21-402 and was sentenced in accordance with K. S. A. 21-403 and K. S. A. 76-2306 to the Kansas State Industrial Reformatory for a term of twenty years. Appeal has been duly perfected.

The appellant contends the trial court erred in three particulars: (1) In allowing the appellant's confession to police officers to go to the jury; (2) in failing to give an instruction on insanity; and (3) in permitting certain rebuttal testimony to go to the jury.

The facts disclosed from the evidence are that in the early morning hours of December 1, 1968, Roy Harden (defendant-appellant) called the Wichita police officers to his residence at 3544 Munger Lane in Wichita, Kansas. Officer Hampton was the first to arrive and as he approached the appellant, who was standing at the north

front door of the duplex, he asked, "Roy, did you call the police?" The appellant replied, "I shot my wife."

Officer Hampton placed the appellant in a police vehicle and then went into the house to ascertain the condition of Katie J. Harden, the appellant's wife. Katie was found lying face up in the back yard approximately six feet from the back porch. She had a gunshot wound to her left eye bordering near the bridge of the nose directly between the eyes. The projectile entered her brain.

Shortly thereafter the appellant was taken by police officers to the Wichita police department. At approximately 1:25 a. m. on December 1, 1968, Detectives Gerald Skelton and Karl Triplett interviewed the appellant at the police department. The interview was commenced by advising the appellant of his constitutional rights in accordance with *Miranda*. The appellant acknowledged that he understood his rights and would speak to the detectives. He thereupon related to the detectives his activities from Thanksgiving Day, 1968, up to and including the time of the shooting of his wife. His recollection of such activities was specific and clear.

On the evening of November 30, 1968, Floyd Meade and his wife, Lois, came to the home of the appellant at about 8:00. Floyd Meade was a staff sergeant at the McConnell Air Force Base employed with the appellant who also worked at the air base. They were friends and spent the evening visiting and drinking from a half gallon bottle of Jim Beam liquor until approximately 11:30 p. m., at which time the Meades left and went to their home. The Meades testified on direct examination for the defense at the trial that the appellant was drunk when they left his home on the night of November 30, and was in a condition incapable of reporting for work or driving a car. On cross-examination, however, they admitted having made a statement to the police officers which was tape-recorded on December 1, 1968. Lois Meade in the the tape-recorded statement said, "He didn't seem drunk to me. . . . No, he wasn't staggering. He wasn't slurring words or anything that would show drunkenness." Sgt. Meade in the tape-recorded statement said, "I wouldn't say he appeared drunk, no." These tape recordings were introduced in evidence and heard by the jury.

The appellant in his statement at 1:25 a. m. on December 1, 1968, informed the detectives that after the Meades had left at approximately 11:30 p. m. on November 30, 1968, he started to argue

with his wife, the decedent, as to her treatment of his friends; that he then went to the night stand in the bedroom and removed a loaded revolver and went back in the kitchen where his wife was standing, and while holding the gun beside his leg he cocked it by pulling back the hammer. When asked why he did this, he replied that in the past when his wife started getting upset the sight of the gun would calm her down.

The appellant further informed the detectives that his wife went running out the back door and he gave pursuit. When he caught up with her the argument resumed. The appellant stated he started waving the pistol and while he was waving it the pistol discharged. He said he saw blood on her face and he ran into the house and called the police. He then sat in a chair and waited until the officers arrived.

Testimony from a ballistics expert of the Wichita police department indicated the absence of nitrates on the person of the decedent. In his opinion, based on this fact, the shot when fired at the decedent was fired from a distance exceeding three feet.

The police detectives took another statement from the appellant at 11:50 a. m. December 1, which confirmed almost word for word the appellant's previous statement. Twice, however, the appellant refused to permit his statement to be tape-recorded. But according to the officers the appellant at no time requested an attorney.

The appellant's evidence centered on the testimony of a psychiatrist, Dr. C. J. Kurth. In Dr. Kurth's opinion, because of the enormous consumption of alcoholic beverage by the appellant and its effect on his mental condition, the appellant could not formulate the necessary criminal intent at the time of the shooting of his wife.

The appellant testified at the trial and his testimony virtually confirmed most of the statements he had previously made to the detectives at 1:25 a. m. on December 1, 1968, and later at 11:50 a. m. the same day. By his testimony and that of his friends, the Meades, the appellant sought to establish that he had consumed an enormous amount of alcoholic liquor on the night of November 30, 1968, and that he was not aware of his surroundings.

Was the appellant's statement given to the police detectives in the early morning hours of December 1, 1968, properly admitted in evidence?

Counsel for the appellant contends the appellant could not have consumed liquor all evening, shot his wife, coupled with the existing mental condition, and then knowingly, voluntarily and intelligently waive his constitutional rights and confess.

It is argued the appellant's testimony at the trial discloses that he can only remember certain things during his purported interrogation.

Relying upon the testimony of Dr. Kurth it is argued:

"Only a competent and qualified Doctor of Psychiatry can look into the mind of the appellant, only then after a battery of tests and examinations and be able to say if the appellant was or was not able to intelligently, knowingly and voluntarily waive his constitutional rights and the Doctor's statement was that the appellant could not knowingly, intelligently and voluntarily waive his constitutional rights."

It is further argued on behalf of the appellant:

"There is more to consider in this case than the alcoholic intake of the appellant. We must bear in mind, 'the guilt' complex and 'shock' that was weight upon the appellant's mind of having just shot his wife and seeing the result of the projectile from his weapon."

Whether a confession was freely or voluntarily given is based upon a consideration of the totality of the circumstances, and where there is a genuine conflict in the evidence great reliance must be placed upon the finder of fact. (*Andrews v. Hand,* 190 Kan. 109, 117, 372 P. 2d 559, cert. denied 371 U. S. 880, 9 L. Ed. 2d 117, 83 S. Ct. 152, and cases cited therein.)

The trial court in the instant case in hearing a motion to suppress the confession of the appellant followed the procedure required by the law of this state in determining the admissibility of a confession, which in all respects conformed to the requirements of *Jackson v. Denno,* 378 U. S. 368, 12 L. Ed. 2d 908, 84 S. Ct. 1774, 1 A. L. R. 3d 1205. (*State v. Milow,* 199 Kan. 576, 433 P. 2d 538.) The trial court found "the defendant was fully advised of his constitutional rights by the officers. That the defendant at the time of making each of his statements had the full capacity and that his judgment was not impaired. The court will further find that the defendant was under no coercion, duress or compulsion at the time the statements were made." It considered the totality of the circumstances surrounding the statements made by the appellant, and found the appellant's statements to have been "freely, knowingly, intelligently and voluntarily given" and admissible in evidence. The motion to suppress was overruled.

At such hearing in the absence of the jury all of the evidence presented by the state and by the defense was heard. Needless to say, the evidence was conflicting as to the degree of the appellant's intoxication.

The police detectives called on behalf of the state, who took the appellant's statement at 1:25 a. m. on December 1, 1968, acknowledged that it appeared the appellant had been drinking because they could smell the odor of alcohol, but they could not detect that the drinking had in any way interfered with his response to questions or his understanding of the questions they were propounding. They testified his answers were very precise and he appeared to be normal.

The officers testified they re-interviewed the appellant at 11:50 on the morning of December 1, 1968, and the statement he made at that time coincided with the statement the appellant had made earlier that morning; that the appellant at all times appeared to be rational and did not appear to be under the influence of intoxicating beverages.

Dr. Kurth formulated his opinion six months after the shooting occurred by examining the appellant on three separate occasions, approximately one-half hour on the first, forty-five minutes on the second, and one hour on the last occasion. The opinion given by Dr. Kurth was premised upon the following suppositions: (1) That the appellant had consumed a considerable amount of alcoholic liquor (a disputed fact); and (2) that the appellant could not specifically remember the events leading up to the shooting of his wife.

In none of the three interviews Dr. Kurth had with the appellant did he examine the appellant under circumstances in which the appellant was inebriated as alleged on the night in question. Dr. Kurth, although not a toxicologist, testified that a person consuming alcoholic beverages would reflect the highest alcoholic content within his body three to five hours after the last intake.

The evidence disclosed at 3:01 a. m. on December 1, 1968, approximately one hour and forty minutes after the beginning of the officers' interrogation, a breathalyzer test was administered to the appellant which disclosed a blood alcohol content of 0.16 percent by weight. (See K. S. A. 1969 Supp. 8-1005 [b].) Dr. Kurth on cross-examination admitted it was quite possible that at 3:01 on the morning in question the appellant's alcoholic content in his blood was at its peak, and that it could have been lower at 1:25 a. m. and prior to that time when the shooting occurred.

This court has recognized medical science is not an exact science, and that it has not developed to the extent that it can diagnose human ailments with the exactitude of the mathematician; that necessarily, there is an element of uncertainty and speculation in the formulation of expert opinion on the mysterious functioning of the human body. ( *Hanna v. Edward Gray Corporation,* 197 Kan. 793, 421 P. 2d 205.) This recognition has led courts to adopt a rule which permits consideration of lay testimony, together with the testimony of expert medical witnesses, to resolve issues in workmen's compensation cases relating to the injury of workmen and the causal relation of such injury to the employment. ( *Hanna v. Edward Gray Corporation,* supra.)

The rule has also been applied when the mental capacity of a testator to make a will is under attack. In the case of *In re Estate of Millar,* 185 Kan. 510, 345 P. 2d 1033, the heirs attacked the validity of a will on the ground that the testatrix was mentally incompetent to make the will. There it was held on the issue of the testatrix' mental capacity to make the will that nonexpert testimony was competent on the question, and the trier of the facts was not bound to adopt the views and opinions of a physician qualified as an expert in psychiatry and neurology to the exclusion of nonexpert testimony.

The same rule was followed in the case of *In re Estate of Roberts,* 192 Kan. 91, 386 P. 2d 301, where on the issue of the testator's mental capacity to make a will nonexpert testimony was held competent, and the trier of the facts was not bound to adopt the opinions of three medical experts to the exclusion of nonexpert testimony.

(For other cases bearing on the subject see *State v. Coltharp,* 199 Kan. 598, 433 P. 2d 418; and *State v. Sagebiel,* 206 Kan. 482, 480 P. 2d 44.)

The same rule applies to the evidence heard by the trial court in the instant case. The trial court was not bound to adopt the opinion testimony of Dr. Kurth to the exclusion of the testimony given by the police detectives concerning the mental condition of the appellant and his degree of intoxication when advised of his constitutional rights and interrogated in the early morning hours of December 1, 1968.

Clearly, the evidence offered by the state and the appellant on the admissibility of the appellant's statements was conflicting, but

the trial court resolved this conflict against the appellant, as it was privileged to do. (*State v. Pittman,* 199 Kan. 591, 433 P. 2d 550.) In giving consideration to the totality of the circumstances the trial court was within its prerogative in finding the confession of the appellant to have been freely and voluntarily given and admissible in evidence.

A similar situation was presented in *State v. Hansen,* 199 Kan. 17, 427 P. 2d 627, where the appellant had been taking insulin for a diabetes condition and was arrested for an offense. After being advised of his rights he confessed to the officers. It was there contended by the appellant that for lack of insulin he was mentally affected when he gave his confession. On conflicting evidence the trial court found Hansen's statement to have been freely and voluntarily given. Since the finding was supported by substantial evidence, it was not disturbed on appeal.

In *State v. Kimmel,* 202 Kan. 303, 448 P. 2d 19, the appellant challenged the admission of a confession made shortly after his arrest on the ground it fell short of the *Miranda* requirements. The appellant there claimed intoxication at the time he executed a written waiver of his constitutional rights and made his statement. The evidence at the hearing to determine the admissibility of the confession was conflicting as to whether Kimmel was inebriated. The trial court found the confession admissible and submitted to the jury an instruction allowing it to determine what weight, if any, should be given to the confession. No objection was made to the instruction of the court in this regard. In the opinion the court said:

"Here the trial court, after hearing all of the testimony, concluded that the waiver and statement should be submitted to the jury with proper instructions. The conclusion was supported by competent evidence and will not be disturbed on appeal. The applicable rule is found in *State v. Jenkins,* supra [197 Kan. 651, 421 P. 2d 33], where it is held:

" 'Where the trial court conducts a hearing in the absence of the jury to determine the admissibility of defendant's written statement, the determination that the statement was voluntarily made, is entitled to the weight commonly accorded findings of trial courts and if supported by competent evidence will not be disturbed on appeal.' (Syl. ¶ 1.)" (pp. 307, 308.)

In the instant case a similar instruction, without objection, was given by the trial court, thereby submitting to the jury for determination what weight, if any, the statements of the appellant were to be given.

The appellant next contends the trial court erred in failing to give an instruction on insanity to the jury.

It must be conceded the parties in a criminal case are entitled to instructions on their respective theories, if supported by competent evidence and if germane to the issues. The instructions, however, must be confined to the evidence, regardless of the theories proposed. In *State v. McDermott*, 202 Kan. 399, 449 P. 2d 545, cert. denied 396 U. S. 912, 24 L. Ed. 2d 187, 90 S. Ct. 226, this court stated:

"The instructions in a criminal case are to be confined to the issues in the case as determined by the charge in the information and the evidence adduced at the trial. . . ." (p. 401.)

If there was evidence presented by the appellant in the case at bar that placed in issue the sanity of the appellant at the time of the commission of the offense charged, then an instruction on insanity was warranted.

At the trial in this case Dr. Kurth testified on redirect examination:

"Q. Would you feel Doctor, in your opinion, was the Defendant sane at 12:00 o'clock on the night of December 1st?

"A. No, sir.

"Q. Was he rational about or knew his position, location, whereabouts, at that time?

"A. He could have been."

Dr. Kurth had previously testified at some length on both direct and cross-examination concerning his examination and the effect of alcohol upon the appellant. He concluded that in his opinion the appellant was not able to form an intent by virtue of loss of emotional, rational control *due to alcoholism*.

Prior to making the statement heretofore quoted on redirect examination, Dr. Kurth on cross-examination testified:

"Q. All right, sir. Now, Doctor, you spoke that under the influence of intoxicating beverage, the Defendant would not know or could not formulate intent. Now, Doctor, what degree of under the influence are we speaking about?

"A. Well, we grade these as Grade 1, 2, 3, and 4, 4 being the depth at which you can perform surgery, so he would not have been under the 4th degree. The 1st degree of intoxication, I understand it as loss of some judgment and control. The 2nd would be increasing loss of judgment and control with beginning loss of some muscle coordination. And the 3rd possibly would increase from there, so I am required to put it in what degree. I would say somewhere between 2nd and 3rd. He had lost sufficient emotional control that rational control would have gotten himself in the circumstances that led up to the act.

"Q. In other words, Doctor, it would be fair, if I may break it down, that you are speaking of maybe between a .20 and .30?

"A. That is possible, yes.

"Q. Now, you would assume then, Doctor, under the opinion you gave, sir, that he would have had to have been between .20 and .30; is that correct?

"A. That is an assumption I would have no way of knowing for sure.

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. All right.   Now, if the reading were less than that, Doctor, then it would seem to me it would affect your opinion somewhat.   Let's put it this way.   If the reading were less than .20, in the neighborhood of .16, this would certainly affect your opinion as to what you state?

"A. It would affect his degree of intoxication which would mean he would have more emotional control than at .20."

The test of criminal responsibility in this  state and in the majority of states is what is commonly referred to as the M'Naghten rule.   An accurate statement  of the law of this state on the point was quoted in the form of an instruction in *State v. Andrews,* 187 Kan. 458, 357 P. 2d 739, at page 465 of the official report.   (Further discussion will proceed on the assumption the reader has familiarized himself with the M'Naghten rule.)

An examination of the appellant's evidence adduced at the trial in the instant case reveals he was not entitled to an instruction on insanity.   By his evidence the appellant attempted to show that he had consumed considerable alcoholic liquor throughout the evening of the fatal shooting of his wife.   The testimony of Dr. Kurth was to the effect that the appellant could not have formed an intent by virtue of loss of rational control *due to alcoholism.* Dr. Kurth gave no indication as to his definition of insanity when the term "sane" was used in a leading question put to him.   At no point in his testimony did Dr. Kurth state the appellant was laboring under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was committing, or if he did know what he was doing that he did not know it was wrong.

Our decisions have previously shown that the temporary loss of one's physical and mental faculties due to voluntary intoxication is not equivalent to an excuse for criminal responsibility when tested by the M'Naghten rule.   (See *State v. Andrews,* supra; and *State v. Coltharp,* supra.)

A case in point is *State v. Rumble,* 81 Kan. 16, 105 Pac. 1 (1909). There the defendant Rumble was convicted of murder in the second degree after admitting that he shot and killed the decedent.   He

defended on the theory of insanity, but the state maintained he was merely intoxicated. On appeal this court reversed for failure of the trial court to give instructions on degrees of manslaughter. However, in its opinion the court discussed the relationship of voluntary drunkenness to the test of insanity as follows:

". . . It necessarily follows that drunkenness so extreme as to prevent the forming of a purpose to kill might under our statute reduce what would have been murder at the common law to manslaughter, and in a proper case instructions to that effect should be given. (See cases cited in subdivision 5 of note in 36 L. R. A. 470, under subhead 'Intent,' and 12 Cyc. 172.) It is to be borne in mind, however, that 'the fact of intoxication, no matter how complete and overpowering, is not conclusive evidence of the absence of an intent to take life' (*The State v. White*, 14 Kan. 538, syllabus), and, as said in *Zibold v. Reneer*, 73 Kan. 312, 'for a person to be too drunk to entertain an intent to kill it would seem that he would have to be too drunk to entertain an intent to shoot.' (Page 320.)

"The court also gave this instruction:

"'If the defendant shot said Frank J. Emery, as charged in the information, and at the time of said shooting he was intoxicated, the mere fact that he may have been intoxicated at said time furnishes no excuse for the killing of said Frank J. Emery, unless his intoxication was of such a degree that he was incapable of knowing the nature and quality of the act of shooting said Emery, or of distinguishing between right and wrong.'

"This was too favorable to the defendant.

"'It can make no difference, where no specific intent is necessary, that the defendant was so drunk as to have no capacity to distinguish between right and wrong.' (12 Cyc. 172.)

"Mental incapacity produced by voluntary intoxication, existing only temporarily at the time of the criminal offense, is no excuse therefor, or defense to a prosecution therefor. . . . The test of insanity as affecting criminal responsibility, that the accused must have labored under such a defect of reason as not to know the nature or quality of the act, or, if he did know it, that he did not know he was doing wrong, does not apply to drunkenness.' (36 L. R. A. 466, note.)

"'Temporary insanity immediately produced by intoxication does not destroy responsibility for crime where the accused, when sane and responsible, voluntarily made himself drunk. To constitute insanity caused by intoxication a defense to an indictment for murder it must be a settled insanity, and not a mere temporary mental condition.' (17 A. & E. Encycl. of L. 405.)" (pp. 21-23.)

The law as set forth in *State v. Rumble*, supra, above, was reaffirmed in *State v. Moffitt*, 199 Kan. 514, 431 P. 2d 879.

Voluntary intoxication was also discussed in *State v. Guthridge*, 88 Kan. 846, 129 Pac. 1143.

Here the appellant's evidence did not overcome the presumption of sanity. In a criminal case the state may rest upon the presumption of sanity in establishing a *prima facie* case. It is then incumbent upon the defendant to overcome that presumption by competent evidence and to reasonably substantiate his plea of insanity. Such evidence must reasonably tend to show that at the time of the commission of the crime the defendant was incapable of distinguishing right from wrong to excuse him from the legal consequences of his acts. (*State v. Penry,* 189 Kan. 243, 368 P. 2d 60.)

The record here does *not* disclose the appellant entered a plea of not guilty by reason of insanity.

It is apparent from the language in the *Rumble* and *Guthridge* cases that the voluntary intoxication of the appellant could have been considered by the jury in weighing his criminal intent, and such voluntary intoxication could have been considered in ascertaining the degree of the offense committed by the appellant. On this point the trial court properly instructed the jury with regard to intoxication by its instruction No. 18, and no objection was made to this instruction.

In addition to the instruction on voluntary intoxication the trial court instructed the jury on second degree murder and manslaughter in the first, third and fourth degrees. No objection was made to these instructions.

We conclude that the trial court did not err in its refusal to instruct the jury on the issue of the appellant's insanity. There was no evidence to support such instruction.

The appellant next complains the trial court erred in allowing certain rebuttal testimony to go to the jury.

The state called as a rebuttal witness Jeanne Hackenburg to rebut the testimony of the appellant as to his drinking and "blackouts" after drinking. On redirect examination of this witness, over the appellant's objection, Jeanne Hackenburg was permitted to testify she had been dating the appellant and the appellant had been staying with her.

It is contended this was not proper rebuttal because it tended to show the jury the appellant was void of any love or affection for his wife, and that it should have been presented by the state as direct evidence. It is further argued this very clearly prejudiced the minds of the jurors because the appellant was of the negro race

and this witness was of the white or caucasian race, which was apparent to the jurors in the trial of the case.

We fail to see merit in the argument advanced by the appellant concerning the rebuttal testimony of Jeanne Hackenburg. On direct examination she testified concerning her frequent dates with the appellant at the NCO Club on Saturday nights and at other places, indicating that he drank "Scotch on the rocks," and that he did not appear to change too much when he had been drinking. She further testified that when he was with her he would not lose control of his emotions when he drank.

On cross-examination, however, she took a different position with respect to the manner in which drinking affected the appellant, inconsistent with statements she had previously made to police detectives.

On redirect examination the state questioned her relative to the black-out periods of the appellant concerning which she testified on cross-examination. She was then asked whether she had spoken to the appellant, and after some questioning admitted that she spoke to him the previous night.

The record discloses the appellant was at liberty on a $2,000 bond pending trial.

The state thereupon pursued Jeanne Hackenburg's interest in the appellant by questions which produced the answers of which the appellant complains.

The inconsistent position of the appellant justified the state in showing to the jury the interest and bias of the witness on behalf of the appellant. The testimony elicited was relevant to show the interest and bias of Jeanne Hackenburg and her opportunity to discuss the case with the appellant. It was also proper to show the close relationship between the witness and the appellant by their living together for a period of time, including the time during the trial. The propriety of the state in examining this rebuttal witness for the purpose of impairing her credibility is supported by K. S. A. 60-420, which reads:

"Subject to sections 60-421 and 60-422, for the purpose of impairing or supporting the credibility of a witness, any party including the party calling him may examine him and introduce extrinsic evidence concerning any conduct by him and any other matter relevant upon the issues of credibility."

(See, also, *State v. Jones,* 202 Kan. 31, 446 P. 2d 851.)

The examination of the rebuttal witness tended to explain her reversal or change of testimony. Under the circumstances the appellant has no standing to complain of the trial court's admission of Jeanne Hackenburg's testimony.

Finding no reversible error, the judgment of the lower court is affirmed.