No. 48,323

THE STATE OF KANSAS, *Appellee,* v. JANICE A. SEELKE, *Appellant.*

(561 P. 2d 869)

Opinion filed March 5, 1977.

*Richard H. Rumsey,* of Rumsey, Cox and Richey, of Wichita, argued the cause, and *James F. Richey,* of the same firm, was with him on the brief for the appellant.

*Stephen E. Robison,* assistant district attorney, argued the cause, and *Curt T. Schneider,* attorney general, *Vern Miller,* district attorney, and *Christopher Randall,* assistant district attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

PRAGER, J.: This is a direct appeal in a criminal action in which the defendant-appellant, Janice A. Seelke, was charged with second-degree murder (K. S. A. 21-3402) and convicted of voluntary manslaughter (K. S. A. 21-3403). At the trial the factual circumstances were not greatly in dispute and essentially were as follows: In the early morning hours of January 25, 1975, the defendant shot and killed her husband, Hubert J. Seelke. The couple had been married for some 15 months and had been experiencing marital difficulties. At the time of the shooting their twin babies were three-months old and were lying in a crib in the room adjacent to where Mr. Seelke was killed. At the time of the shooting the defendant weighed

approximately 104 pounds; the decedent weighed approximately 200 pounds and was 6'2" tall. Hubert J. Seelke had been released from the psychiatric ward of St. Francis Hospital in Wichita on the afternoon prior to the shooting. On the way home he became upset with the defendant, got out of the car, and immediately starting drinking. He first went to a friend's house and then to two private clubs. From there Hubert and two companions drove to the Seelke residence at approximately 11:00 p. m.

The evidence was undisputed that Hubert was a mean drunk at the time he arrived home. The defendant was asleep when the trio arrived at the Seelke home but awoke upon hearing a banging at the door. She looked out and saw her husband with two persons whom she described as "hippies" who were jumping up and down making a lot of noise. Defendant refused to let her husband's companions into the house and they departed. The state's evidence indicated that the defendant threatened her husband and friends if they did not leave. One of his drinking companions testified he saw a silhouette of the defendant inside the house holding a shotgun.

From this point the circumstances of the shooting and the events immediately prior thereto came from the lips of the defendant, Janice A. Seelke. After Hubert's companions left the area, he entered the house. He obviously had been drinking heavily and his eyes were glassy. She criticized him for drinking. He referred to her friends as "whores" and "bitches." She then went back to bed. Hubert followed her into bed and demanded that she have intercourse with him. She refused. He jumped on top of her and began beating her. He struck her under her right breast and then continued hitting her as hard as he could. During the beating he advised her that if she and the babies were not going to New York with him he was "going to kill all three of you." He hit her on the head, bit her on the leg, pulled a portion of her clothing off, and forced her to have intercourse. He then forced her to have anal intercourse. According to defendant during the episode Hubert strangled her and she passed out on three separate occasions.

She jumped out of bed. He threatened her again with anal intercourse and stated that he intended to kill her and the babies. She grabbed a shotgun which was standing next to the bed. He again threatened to kill her and the babies and she shot him three times. He was still threatening her when she reloaded the gun and fired a fourth shot.

The defendant testified in detail as to her state of mind at the time the shots were fired. She stated that she did not know where any of the shots went. She was frightened, scared, and hurting. She did not want to kill, or hurt, or shoot him. But also she did not want to die or have her babies die. If she had wanted to kill him, she would have aimed at his heart or brain or temple. She only wanted to prevent him from coming after her and from killing her and the babies like he said he was going to do. Medical evidence indicated that three of the shots struck Hubert, with the fatal shot hitting him in the right side of the chest. There was evidence that no fragment from the fourth shot entered his body. At the time she fired the fourth shot he was raising up, continuing to threaten to kill her and the babies. The entire shooting incident took a matter of seconds.

The Seelke home where the shooting occurred was located in rural Sedgwick county. Defendant had no car, no telephone, and the nearest neighbor was one-half mile away. After the shooting the defendant ran to the neighbor's residence and requested that she call the police and an ambulance. Later, because of her physical condition, defendant was taken to the emergency room of St. Francis Hospital. A physician testified as to defendant's condition, substantiating the beating she suffered from her husband. One of the defendant's eyes was swollen half shut and discolored. There was discoloration across the bridge of her nose, her lip was swollen and cut, and there were innumerable bruises over the ribs on her left side. There was a tear of her vagina and her abdomen was very tender. She complained of severe headaches and the doctor referred her to a neurologist.

At the trial the defendant offered testimony as to the stormy marital relationship of the Seelkes. Hubert Seelke was described as a "Dr. Jekyll and Mr. Hyde." He was a diabetic, and when drinking became an explosive and abusive personality. He would physically abuse his wife, threaten his own life and the lives of his wife and infant children, break windows and black out for periods of time. The couple sought psychiatric help for Hubert from the psychiatric ward of St. Francis Hospital. Both the defendant and Hubert were concerned about his erratic behavior, his heavy drinking, and his physical mistreatment of defendant. The doctor warned Hubert in the presence of his wife that drinking alcohol would be like "lighting a match to a gasoline can."

Following the shooting the defendant gave statements to the

police both that evening and several days later. Although there were some inconsistencies between these statements and her testimony at the trial, defendant consistently denied having any intention to kill her husband, stating that she shot him only to protect the lives of herself and the babies.

The testimony at the trial was not all in defendant's favor. The state's evidence indicated that when Hubert knocked at the door of the home, she stated "You can't come in and if you do I will shoot you." The evidence further established that the physical characteristics of the shotgun required the defendant to pump the second and third shells into the chamber before firing them and required her to reload the gun before firing the fourth shot. Defendant first denied that she had reloaded the shotgun but later changed her story, saying that she did reload the gun because he was still moving. She also stated that Hubert had told her if she shot him she had better kill him. As noted above the defendant was convicted of voluntary manslaughter and she now appeals from that conviction.

The primary issue raised by the defendant on this appeal is that the trial court erred in failing to instruct the jury on involuntary manslaughter (K. S. A. 21-3404) as a lesser degree of the crime of murder. The duties of a trial court to instruct on lesser included crimes is governed by K. S. A. 21-3107 (2) and (3) which provide:

"21-3107. . . .

"(2) Upon prosecution for a crime, the defendant may be convicted of either the crime charged or an included crime, but not both. An included crime may be any of the following: (a) A lesser degree of the same crime;

"(b) An attempt to commit the crime charged;

"(c) An attempt to commit a lesser degree of the crime charged; or

"(d) A crime necessarily proved if the crime charged were proved.

"(3) In cases where the crime charged may include some lesser crime it is the duty of the trial court to instruct the jury, not only as to the crime charged but as to all lesser crimes of which the accused might be found guilty under the information or indictment and upon the evidence adduced, even though such instructions have not been requested or have been objected to."

Where a person is charged with murder in the first degree (21-3401), the crimes of murder in the second degree (21-3402), voluntary manslaughter (21-3403), and involuntary manslaughter (21-3404) are considered to be lesser degrees of the crime charged. However, under 21-3107 (3) the court's duty to instruct on a lesser degree of a crime arises only where there is evidence upon which the accused might reasonably be convicted of the lesser offense. In order for such an instruction to be required some evidence

must be presented tending to show that defendant should be convicted of the lesser included offense. If no evidence of the lesser offense is presented, an instruction on the lesser offense should not be given. (*State v. Burrow & Dohlmar*, 221 Kan. 745, 561 P. 2d 864; *State v. Masqua*, 210 Kan. 419, 502 P. 2d 728.)

The duty to instruct on lesser included offenses is stated in *State v. Clark*, 214 Kan. 293, 521 P. 2d 298, in syllabus ¶ 4 and 5 as follows:

"It is the duty of a trial court to instruct the jury not only as to the crime specifically charged in the information but also with respect to such lesser offenses included therein as the evidence may justify, even though such instructions have not been requested or have even been the basis of objections. (Syl. ¶ 4.)

"The accused has the right to have his theory of the case presented to the jury under appropriate instructions, where there is support in the evidence therefor, even though the evidence may be weak and not conclusive and the testimony of the defendant alone, if tending to show a lesser degree of crime, is sufficient to require the court so to instruct." (Syl. ¶ 5.)

For an excellent analysis of the subject see Adam and Dupre, *The Doctrine of Lesser Included Offenses in Kansas*, 15 Washburn L. J. 40 (1976).

The question of whether there should be given an instruction on the lesser included offense of involuntary manslaughter in a particular murder case has caused the trial courts of this state some difficulty during the past five years. (*State v. Weyer*, 210 Kan. 721, 504 P. 2d 178; *State v. Clark*, supra; *State v. Childers*, 217 Kan. 410, 536 P. 2d 1349.) It would be helpful to review some of the murder cases and note the general principles which have been applied in resolving the issue. In some cases the undisputed factual circumstances showed no mitigating circumstances which justified the trial court in instructing the jury on the lesser degree of involuntary manslaughter. Examples are cases where the defendant was charged with felony murder and the undisputed evidence established the commission of the homicide during the perpetration of a felony. In *State v. Masqua*, supra, the homicide was committed during the perpetration of a forcible rape. The defenses were that (1) the defendant did not commit the offense and (2) if he did he was intoxicated. It was held that failure to give instructions on the lesser included offenses of second-degree murder and manslaughter was not error since there was nothing in the evidence to justify such instructions. The court held that if the defendant was present at the rape, the mere participation in that felony

would supply the elements of deliberation and premeditation and he would be guilty under the felony-murder rule. Either the rape was perpetrated by the defendant and he necessarily was responsible for the murder, or he was not present at the rape where the killing occurred and not guilty of any degree of homicide.

In *State v. Reed*, 214 Kan. 562, 520 P. 2d 1314, the homicide occurred during a robbery. The defendant denied that he was present when the robbery occurred. It was held that instructions on lesser degrees of the crime of murder would have been improper under the circumstances of the case. In *State v. King*, 219 Kan. 508, 548 P. 2d 803, two men entered the home of the victim and advised his wife that they had a $3,000 contract to kill her and her husband. When her husband arrived home he was confronted by the intruders and shot in the back. Defendant was later charged with first-degree murder. The defense was alibi—a denial of participation in the crime. It was held that instructions on the lesser degrees of homicide were properly refused because the undisputed evidence showed a malicious, premeditated murder. In *State v. Goodseal*, 220 Kan. 487, 553 P. 2d 279, the homicide occurred during the commission of a felony, possession of a firearm in violation of K. S. A. 21-4204 (1) (*b*). Instructions on second-degree murder and involuntary manslaughter were held to be unnecessary. In *State v. Bradford*, 219 Kan. 336, 548 P. 2d 812, there was conflicting evidence as to the commission of a robbery and a legitimate issue of fact was raised as to whether the homicide was committed with premeditation and deliberation. Hence, it was held that the evidence in the case justified instructions on the lessor degrees of homicide.

In some cases the homicide occurred under factual circumstances where there was no evidence of provocation or explanation or excuse and the evidence established that the defendant was either guilty of murder or nothing at all. An example is *State v. Stafford*, 213 Kan. 152, 515 P. 2d 769, where the state's evidence showed that defendant wife in the course of a family row squirted her husband in the eyes with a paralyzer spray from a pressurized can rendering him helpless. She wrapped the cord from an electric tea kettle around his neck and choked him with it. She threw him down on the floor in a dazed condition and then proceeded to strangle him. The defendant offered no evidence in her defense. It was held that the evidence was insufficient to warrant an instruction on voluntary manslaughter. Although there was some

evidence of a prior quarrel and even a blow being struck by the deceased husband, the court held that insufficient provocation existed to reduce to voluntary manslaughter the eventual strangulation of one flat on his back in a disabled condition.

In *State v. Wilson,* 215 Kan. 437, 524 P. 2d 224, the defendant, an inmate of the Kansas penitentiary, was accused of intentionally pushing another inmate from the fourth tier of cells at the penitentiary, thus causing his death. The defendant was charged with second-degree murder. The defense was that the fall was an accident. The defendant did not testify. The jury was instructed on second-degree murder and on voluntary manslaughter since there was evidence of a killing in a heat of passion. It was held that an instruction on involuntary manslaughter was properly refused since there was no evidence from which the jury could reasonably conclude that the defendant killed his fellow inmate but did not intend his death.

In some cases the evidence presented at the trial has tended to show some provocation or mitigating circumstances providing an explanation for the killing or raising a legitimate issue as to whether the defendant had the intention to kill the decedent. An intent to kill is a necessary element of murder in the first degree (K. S. A. 21-3401 [1]), murder in the second degree (K. S. A. 21-3402) and voluntary manslaughter (K. S. A. 21-3403). Under certain circumstances in a murder case where a defendant asserts the defense of voluntary intoxication an instruction may be required on the lesser offense of involuntary manslaughter which does not require the specific intent to kill. K. S. A. 21-3208 provides in substance that an act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind. In *State v. Rumble,* 81 Kan. 16, 105 Pac. 1, this court held that drunkenness may reduce a homicide from murder to manslaughter if it is so extreme as to prevent the existence of an intention to kill. In that case a new trial was granted to the defendant who was charged with murder where the court failed to instruct on the effect of voluntary intoxication. *State v. Rumble,* supra, is cited with approval in *State v. Harden,* 206 Kan. 365, 480 P. 2d 53.

An instruction on involuntary manslaughter may be required where there is some evidence in the case showing that the deceased

provoked the defendant to commit the act so as to support a claim of self-defense or a killing without intent to kill. Examples of such cases are the following: In *State v. Weyer,* supra, a shootout occurred between a young man and the relatives of his girlfriend. The girl's relatives pursued the defendant's vehicle, intercepted the same and threatened the defendant. The defendant admitted that he had fired a weapon but denied any intention to kill his girlfriend's brother. The evidence was disputed as to when and under what circumstances the lethal shot was fired. The defendant claimed that he fired in self-defense. Under these circumstances it was held that the trial court erred in failing to instruct on involuntary manslaughter. In *State v. Clark,* supra, a fatal fracas occurred between the defendant and his girlfriend in which the defendant beat her up with his fists and she died. It was held that there was sufficient evidence before the court to require instructions on second-degree manslaughter and fourth-degree manslaughter. The defendant testified that the decedent lunged at him with a butcher knife, repeating that she was going to kill him. Under the circumstances this court held that instructions on the lesser degrees of homicide should have been given and ordered a new trial. In *State v. Childers,* supra, a heated controversy existed between the defendant and a neighboring family. The defendant fired a gun out the window of his residence at his neighbor who was in defendant's yard in the nighttime. At the trial the defendant testified that he was afraid the deceased was going to hurt him or possibly his wife and that he thought the deceased had a gun. The defendant further testified that he was firing into the ground into the dark only for the purpose of scaring him away. He denied an intent to kill. On appeal it was held that the trial court erred in failing to instruct the jury on involuntary manslaughter and a new trial was ordered.

Another recent case is *State v. Gregory,* 218 Kan. 180, 542 P. 2d 1051. There the defendant and the deceased had a heated argument in a tavern. The deceased was ejected from the tavern by the owner at the point of a sawed-off shotgun. Later the deceased called the defendant outside. A shot was heard. Others inside the tavern immediately went to the door and observed the defendant on the tavern steps, pistol in hand, and the deceased's body on the ground ten to twenty feet away. Defendant was charged with second-degree murder and he claimed self-defense. He testified that the deceased came at him with an open knife threatening to

kill him. He retreated to the tavern door, tried to open it, and found it was locked. He fired at the deceased in order "to stop him," but not intending to kill him. There were no other witnesses to the shooting. At the trial the defendant objected to an instruction on involuntary manslaughter. This court held that it was not error to give such an instruction since involuntary manslaughter was a lesser degree of murder and under the evidence the jury could reasonably have convicted the defendant of the lesser offense. In the opinion we stated that whether the *shooting* was intentional is not the important factor; what controls under the statute is whether the *killing* was intentional. Although it was undisputed that the defendant intentionally shot his victim, the jury might well have believed that he did not intend to kill him but only, in his words, "to stop him."

In its brief the state takes the position that an involuntary manslaughter instruction is not proper in a murder trial where the defendant claims self-defense. As noted above our cases hold otherwise. In fact an instruction on involuntary manslaughter may be most appropriate in a case where the defendant admits that he used a weapon and killed the decedent but states that he did so only in self-defense. Quite often in such cases the defendant's life is threatened by the deceased and as a result the defendant is placed in a position of extreme fear or severe mental stress so that the defendant acts impulsively without an opportunity to reflect. In those cases, where the defendant denies an intent to kill, an instruction on involuntary manslaughter is required.

*State v. Clark,* 218 Kan. 18, 542 P. 2d 291, is a case with factual circumstances quite similar to those of the case at bar. The defendant Clark had had a stormy marriage. The defendant received a package from his ex-wife and children in Germany. He and his present wife, the deceased, found in the package several tape recordings made by the children of the previous marriage. His wife, after listening to the tapes, became extremely upset and called her mother stating she was going to get a divorce. Shortly thereafter the defendant heard his wife say something that startled him. He turned around, saw his wife pointing a gun at him and he panicked. He testified that he reached for his own gun, but that he could not remember firing at his wife. The wife later died of three gunshot wounds fired by the defendant. The defendant was later tried and found guilty of voluntary manslaughter by a jury. The court refused to instruct on involuntary manslaughter.

On appeal we held that failure to so instruct was error. By his testimony the defendant raised a factual issue as to his intent to kill his wife. We stated that, although the evidence of an unintentional killing was weak and inconclusive, the jury might have concluded from the defendant's account of the incident that he did not intend to kill his wife and therefore an instruction on involuntary manslaughter was required.

We must now consider the facts as shown by the record in this case to determine whether the trial court erred in denying defendant an instruction on involuntary manslaughter. We have concluded that the trial court erred and that a new trial should be granted. Here the evidence was undisputed that the defendant Janice A. Seelke was subjected to a vicious and brutal attack by her husband. Defendant testified that he threatened not only her life but the lives of her babies. He sexually abused and beat her about the head and body. The defendant testified that she fired the weapon only to save her life and to protect herself and her children. She fired aimlessly, not knowing where the shots were going. She testified clearly and unequivocally that she was only trying to stop her deceased husband and had no intention of killing him. The defendant was obviously placed in a mental state of great fear and severe stress where it would be extremely difficult for her to act calmly and with reflection. The evidence showed circumstances of provocation which gave rise to a legitimate claim of self-defense. The defendant's testimony raised a legitimate issue as to whether she had an intent to kill her husband and thus the trial court erred in failing to give an appropriate instruction on involuntary manslaughter. On this point the case must be reversed and a new trial granted.

The second point raised by the defendant on the appeal is that the court erred by severely limiting the testimony of certain defense witnesses. The defendant contends that the trial court erred in refusing to permit certain testimony of Dr. Frank M. Tilton, who examined the defendant some two months following the shooting. According to the proffer, Dr. Tilton would have testified that two months after defendant was beaten by her husband, the defendant was still suffering severe and continuing headaches. The trial court refused to permit the testimony, stating in essence that it was immaterial to the claim of self-defense because there was testimony from other physicians who examined defendant within 24 hours after the shooting and testified in detail as to her condition.

In view of this other testimony we cannot say that the trial court abused its discretion in excluding Dr. Tilton's testimony since the evidence was cumulative. However, we must say that the trial court was somewhat restrictive in its ruling since the state had offered evidence tending to minimize the injury suffered by the defendant during the beating.

The trial court also excluded the testimony of Ralph Draper which was in the form of a transcript taken at the preliminary hearing. At the time of the trial Draper's whereabouts were unknown and he was unable to testify. His testimony at the preliminary hearing was to the effect that he had three drinks with Hubert Seelke on the afternoon preceding the shooting and then drove Hubert to a tavern later that evening. The state objected to the admission of the evidence on the grounds that the defense had failed to show that Draper was unavailable and further on the basis that the evidence was immaterial. The trial court denied admission of Draper's testimony because it was cumulative in view of the testimony of Hubert Seelke's drinking companions that he had been drinking between 8:00 and 10:00 on the evening of the killing. Furthermore, the autopsy report indicated that the deceased had sufficient alcohol in his system to be declared to be under the influence of alcohol if he were driving an automobile. Under the circumstances we do not see how the defendant could have been prejudiced by the denial of admission of Draper's testimony, although we do not understand why its admission was so vehemently opposed by the prosecutor.

The defendant claims the trial court excluded certain proffered testimony of Dr. John Lester. We have examined the record and find no testimony of that witness excluded over the objection of the defendant. It appears to us that Dr. Lester was permitted to tell the jury everything he knew on the subject of the deceased's mental state. We also have read the testimony of Dr. Thomas F. Morrow in the record. Dr. Morrow was permitted to testify concerning the harm alcohol could cause Hubert Seelke and also his potential for erratic and violent behavior. Any restriction of his testimony by the court in our judgment was harmless.

The defendant also maintains that the trial court erred in excluding proffered testimony of Glenda Sigars, Helen Brockway, and Jacqueline Webber. These witnesses would have testified as to statements made by the decedent a few days prior to the shooting concerning the effect of alcohol upon him and the fact that such

statements were subsequently relayed to the defendant. They would have further testified as to defendant's expressions of fear of her husband prior to the shooting and other incidents of violence of the decedent toward his wife prior to the shooting. The trial court excluded this testimony as immaterial to the trial of the case. We agree with the defendant that such rulings were in error. One of the important issues in the case was the defendant's state of mind and such evidence was relevant on that issue. (*State v. Patterson,* 200 Kan. 176, 434 P. 2d 808; *State v. Blocker,* 211 Kan. 185, 505 P. 2d 1099.) We have concluded from a reading of the entire record that the trial judge by its rulings unduly restricted the defendant in the presentation of her defense. The defendant in this case is entitled to a new trial on a charge of voluntary manslaughter since she has been acquitted of second-degree murder. (K. S. A. 21-3108 [5].)

For the reasons set forth above the judgment of the district court is reversed and the case is remanded to the district court with directions to grant the defendant a new trial on a charge of voluntary manslaughter (K. S. A. 21-3403) in accordance with the views expressed in this opinion.