No. 51,304

STATE OF KANSAS, *Appellee* and *Cross-Appellant,* v. LEE LUTHER RAMSEY, *Appellant.*

(612 P.2d 603)

Opinion filed June 14, 1980.

*David W. Boal,* of Carson, Fields, Boal, Jeserich and Asner, of Kansas City, Kansas, argued the cause and was on the brief for the appellant.

*Nick A. Tomasic,* district attorney, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the brief for the appellee and cross-appellant.

The opinion of the court was delivered by

McFARLAND, J.: Lee Luther Ramsey was convicted by jury trial of conspiracy to commit first degree murder (K.S.A. 21-3302 and K.S.A. 21-3401), aggravated kidnapping (K.S.A. 21-3421), and first degree murder (K.S.A. 21-3401). Defendant appeals his convictions and the State cross-appeals on a question reserved.

Before proceeding to the issues raised on appeal, a brief state-

ment of the facts is appropriate. On June 7, 1978, a fisherman observed a 55-gallon metal drum partially submerged in the shallow Marmaton River near Uniontown, Kansas. His curiosity aroused, the fisherman slit the canvas cover on the top of the drum and discovered it contained a human body wrapped in chains. The remains were identified as those of Larry Briggs, a Kansas City, Kansas, businessman who had been missing since May 8, 1978. The cause of death was two gunshot wounds to the back of the head.

The K.B.I. conducted the investigation. On June 28, 1978, Jean Briggs, widow of the deceased, told a K.B.I. agent that she had hired the defendant to kill her husband. Charges were filed against both Jean Briggs and defendant. Subsequently, Jean Briggs pled guilty to second degree murder and to the conspiracy charge and testified for the State at defendant's trial.

Defendant's first issue on appeal is whether the trial court erred in permitting the State to cross-examine defendant as to the reason a prior employment terminated and in admitting an exhibit relative to such termination.

On direct examination defendant testified he had worked for United Parcel Service (U.P.S.) for three years. The following questions were then asked and answered:

"Q. And when did you terminate your employment there?
"A. In March of '78.
"Q. What did you do after working for United Parcel?
"A. Well, I wanted to get into a business for myself so I was going to go into business with my brother-in-law to learn the business and start one.
"Q. And that's the carpet cleaning business?
"A. Yes."

On cross-examination the following questions were asked and answered:

"Q. Now, I'm interested—why did you say you left U.P.S.?
"A. I quit U.P.S. to go into business with my brother-in-law, so I could go into business for myself.
"Q. That's the reason you left?
"A. Yes."

The State then produced a written statement signed by defendant wherein he admitted embezzling $681.22 from U.P.S. Defendant, upon further cross-examination, acknowledged his signature on the statement but denied he was involuntarily terminated as a result of the embezzlement. Defense counsel ob-

jected to the whole line of cross-examination relative to U.P.S. and to the admission of the statement. The objection was on the grounds of irrelevancy and unfair surprise in that the State had not previously disclosed the existence of the statement. The State contended the reason defendant left U.P.S. employment was a proper subject for impeachment. The State also noted that the statement was not obtained by law enforcement personnel, as it had been secured by U.P.S. as a result of its own internal procedures. As a rebuttal witness the State called the U.P.S. manager who stated that defendant had been fired as a result of the embezzlement and tied defendant's statement into the termination. The U.P.S. manager had been endorsed as a witness prior to trial.

K.S.A. 60-420 provides:

"Subject to K.S.A. 60-421 and 60-422, for the purpose of impairing or supporting the credibility of a witness, any party including the party calling the witness may examine the witness and introduce extrinsic evidence concerning any conduct by him or her and any other matter relevant upon the issues of credibility."

The direct examination of defendant left the impression that defendant had voluntarily terminated his U.P.S. employment, in essence, to better himself. On cross-examination this was inquired into and amplified. The statement was not taken by law enforcement officers. The subject was raised on direct examination and was legitimately an area of cross-examination. When defendant admitted making the statement, but denied the embezzlement was the cause of his termination, the State had the right to call the rebuttal witness and introduce the statement. This was a proper subject on which to impeach the witness. No error is shown.

Defendant's next issue is whether the trial court erred in limiting defendant's cross-examination of Jean Briggs. On cross-examination the following occurred:

"Q. Now, initially in this case, Mrs. Briggs, you were charged with the same crimes that Mr. Ramsey is charged with here, is that correct?
"A. Yes, sir.
"Q. And they were two Class 'A' felonies and a Class 'C' felony, is that correct?
"A. I was charged with first degree murder, kidnaping and conspiracy.
"Q. And what did you plead guilty to?
"A. Second degree murder and conspiracy to commit first degree murder.
"Q. And you say you were sentenced on the 26th of March?
"A. The 23rd of March.

"Q. I'm sorry, the 23rd of March. Mrs. Briggs, are you aware that the Court has one hundred twenty days—"

At this point the State objected on the ground of materiality. At a bench conference the following colloquy occurred between the court and defense counsel:

"THE COURT: I'm sure you don't mean to imply that whoever the sentencing judge was in this case has made any kind of an arrangement?

"MR. BOAL: I'm just going to ask her if she is aware that the court has one hundred twenty days to modify the sentence.

"THE COURT: That's not proper. You are attempting to leave the impression with the jury—you have every right to ask her if she had been promised anything, or had she been led to believe or whatever, but I don't think it's proper to involve the judge. If you have some evidence of that, then you ought to make it, but I don't think you ought to try to leave the impression the judge has 120 days to modify the sentence—that one of the judges has been involved in some kind of an arrangement. I think that's unfair to the judge and unfair to the jury, unless you have some evidence.

"MR. BOAL: Well, Your Honor, the judge certainly isn't going to suffer by that, there's no question about that. Now, I don't know why, but the Court gets awfully sensitive when a witness is asked about it. If she doesn't know, she can say that she doesn't know.

"THE COURT: No, we have made a record and you can ask her whatever you want to about what arrangements have been made, but not that way."

Defense counsel then cross-examined Mrs. Briggs as to her knowledge of when she would be eligible for parole and as to the difference in penalties between the original charges and those to which she entered her pleas of guilty.

Defense counsel contends he was denied the opportunity to inquire as to whether or not Jean Briggs had made some arrangement or deal with the State in exchange for her testimony. If such limitation on cross-examination had occurred this would be a serious matter. See *State v. Com*, 223 Kan. 583, 575 P.2d 1308 (1978). The record above set forth, however, reveals that the defense counsel was free to inquire whether the witness had been offered any arrangement or deal in exchange for her testimony. The only limitation went to the form of the question. This point is without merit.

Defendant's third and final issue on appeal is whether or not the trial court erred in denying his motion for a new preliminary hearing. In determining this issue some additional facts must be set forth.

Prior to the filing of any charges, Jean Briggs confessed her

involvement in her husband's death and implicated defendant Ramsey. On August 17, 1978, a joint preliminary hearing was had before Judge Robert J. Foster relative to both Briggs and Ramsey. Briggs did not testify. Both were bound over for trial.

On October 13, 1978, defendant herein (Ramsey) filed the following motion:

"MOTION FOR NEW PRELIMINARY HEARING

"Comes now the defendant and moves the Court for an order granting defendant a new preliminary hearing for the reason that the Court repeatedly admitted evidence that clearly should have been excluded and which, in total effect, served to deprive the defendant of his right to a preliminary hearing."

The motion was heard by Judge Harry G. Miller, who reviewed the transcript of the preliminary hearing and overruled the motion on December 26, 1978.

Although Jean Briggs did not testify at the preliminary hearing, Thomas Litchfield testified therein as to certain statements made by her which incriminated defendant Ramsey, said statements having been made after the charged conspiracy had ended. Defendant objected thereto on the ground that such testimony was hearsay as to him. Defendant requested a new preliminary hearing rather than discharge.

Preliminary hearings are held pursuant to K.S.A. 1979 Supp. 22-2902. This court stated the purposes of preliminary hearings in *State v. Boone,* 218 Kan. 482, 485, 543 P.2d 945 (1975), *cert. denied* 425 U.S. 915 (1976), as follows:

"Thus a preliminary examination affords the person arrested as a result of a complaint an opportunity to challenge the existence of probable cause for further detaining him or requiring bail. Also, a preliminary examination can give the accused general information about the nature of the crime charged and apprise him of the sort of evidence he will be required to meet when he is subjected to final prosecution in the district court (*In re Mortimer,* 192 Kan. 164, 386 P.2d 261). The object of a preliminary examination is not to determine the guilt or innocence of the accused. The examining magistrate has no power to acquit but only the power to discharge from custody. Such discharge is not a bar to another prosecution (*State v. Bloomer,* [197 Kan. 668, 421 P.2d 58 (1966), cert. denied 387 U.S. 911 (1967)]). The magistrate in a felony case has no jurisdiction to arraign the accused or to accept a plea of guilty of the charge (*State v. Talbert,* 195 Kan. 149, 402 P.2d 810, cert. den. 382 U.S. 868, 15 L. ed 2d 107, 86 S.Ct. 143). To iterate, a magistrate conducting a preliminary examination serves a limited function—to determine whether a crime has been committed and whether there is probable cause to believe that the accused committed it."

See also *State v. Holloway,* 219 Kan. 245, 547 P.2d 741 (1976);

*State v. Dunnan,* 223 Kan. 428, 573 P.2d 1068 (1978). In *In re Mortimer,* 192 Kan. 164, 166, 386 P.2d 261 (1963), this court stated:

"At the outset it may be stated a preliminary examination is not a trial of a defendant's guilt; it is rather an inquiry whether the defendant should be held for trial. Its principal purpose is the determination of whether a crime has been committed and whether there is a probability that the defendant committed the crime. Its main object is to apprise the accused of the nature of the crime or crimes charged against him, and to apprise him partially, at least, of the sort of evidence he will have to combat when he is subjected to formal prosecution in the district court."

We have carefully examined the record and conclude that even with the objected-to portion of Litchfield's testimony excised, there was sufficient circumstantial evidence to substantiate a finding of probable cause that the charged crimes had been committed by defendant Ramsey. We also note that the conviction appealed from arose from defendant's second trial on the charges herein. Defendant's first trial ended in the declaration of a mistrial on March 5, 1979, after the jury was unable to reach verdicts. The second trial was commenced on May 22, 1979, with verdicts being returned on May 31, 1979. The evidence adduced at both trials was apparently essentially the same. Under such circumstances defendant was as fully apprised of the evidence against him, and the nature of the charges, as one could ever expect to be. Certainly, defendant was not prejudiced by the preliminary hearing. We conclude this point is without merit.

On its cross-appeal the State contends the trial court erred in refusing to sentence defendant pursuant to K.S.A. 1979 Supp. 21-4618. The record relative to this issue is somewhat confusing. It appears, however, that the court held two sentencing hearings (July 5 and July 9, 1979, respectively). At the first hearing the court was under the impression that if any defendant used a firearm in the commission of the crime, then all defendants were subject to the mandatory sentencing provision of K.S.A. 1979 Supp. 21-4618. The court concluded that a firearm had been used in the crime. At the second hearing the court excised the reference to the mandatory sentencing statute from the journal entry. In so doing, the court acknowledged that it had operated on the above-stated erroneous assumption at the first hearing. The court noted that the instructions to the jury permitted conviction of first degree murder if the jury found:

"Larry Briggs was killed by defendant, or the defendant Lee Ramsey, aided, abetted or assisted in killing Larry Briggs, or procured someone else to do so;"

The court then explained why reference to the mandatory sentencing statute was being excised. The court's rationale, in summarized form, was this. Under the foregoing instruction the jury could have convicted defendant of first degree murder without finding defendant personally fired the fatal shots. The logistics of the crime concerned the court. The deceased was a large man. The court questioned whether it was physically possible for defendant to have carried out the crime and the disposal of the body without assistance. There was no testimony as to the details of the crime. Jean Briggs testified that defendant told her no particulars of the crime and only advised her the matter had been taken care of. The court concluded it had heard the evidence and had a reasonable doubt as to whether defendant actually fired the shots. The court also noted that defendant's parole eligibility would be the same whether or not reference was made to K.S.A. 1979 Supp. 21-4618.

The State contends there was no evidence that an accomplice was involved and that the court erred in failing to follow the mandate of K.S.A. 1979 Supp. 21-4618. Jean Briggs testified she hired defendant to kill her husband. Defendant denied involvement in the homicide and offered an alibi defense. Under such circumstances the State contends the court was required to sentence under K.S.A. 1979 Supp. 21-4618, which provides:

"(1) Probation or suspension of sentence shall not be granted to any defendant who is convicted of the commission of the crime of rape, the crime of aggravated sodomy or any crime set out in article 34 of chapter 21 of the Kansas Statutes Annotated in which the defendant used any firearm in the commission thereof and such defendant shall be sentenced to not less than the minimum sentence of imprisonment authorized by law for that crime. This section shall apply only to crimes committed after the effective date of this act. This section shall not apply to any crime committed by a person under eighteen (18) years of age.

"(2) When a court has sentenced a defendant as provided above, the court shall state in the order of commitment to the secretary of corrections that the defendant has been sentenced pursuant to this section 21-4618."

Defendant received a life sentence on the first degree murder conviction—the only sentence which may be imposed for a Class A felony. Clearly, the sentence imposed complied with section (1) of the above statute. The State's complaint involves section (2) of said statute. This section requires that the order of commitment show that sentencing is pursuant to said statute.

The sentences herein were designated to run concurrently. Under the facts of this case the controversy appears to have some of the characteristics of the proverbial tempest-in-a-teapot. As far as parole eligibility is concerned, the relevant sections of K.S.A. 1976 Supp. 22-3717 are:

"(2) After expiration of one hundred twenty (120) days from the date of sentence, the Kansas adult authority is hereby granted the authority to place upon intensive supervised parole any inmate classified in the lowest minimum security classification who has achieved such status under rules and regulations promulgated by the secretary of corrections, except in the case where a death sentence or life imprisonment has been imposed as the minimum sentence or where the minimum sentence imposed aggregates more than fifteen (15) years, after deduction of work and good behavior credits. Persons confined in institutions shall be eligible for parole after fifteen (15) years if sentenced to life imprisonment or to a minimum term which, after deduction of work and good behavior credits, aggregates more than fifteen (15) years.

. . . .

"(8) Notwithstanding any other provision of this section, any person sentenced pursuant to K.S.A. 1976 Supp. 21-4618 shall not be eligible for parole therefrom prior to serving the entire minimum sentence imposed, except that in the case of a person convicted of a class A felony and sentenced pursuant to K.S.A. 1976 Supp. 21-4618 shall not be eligible for parole prior to serving (15) years of the sentence imposed."

It would appear that regardless of whether or not defendant was sentenced under the mandatory sentencing statute, parole eligibility would occur after defendant has served fifteen years of his sentence.

The State's principal concern, as expressed at the sentencing hearings and on appeal, arises from the fact K.S.A. 1979 Supp. 21-4603 grants the district court the power to modify a sentence within 120 days after the conviction has been affirmed on appeal. The State repeatedly expresses the concern that whereas the trial judge herein would be unlikely to modify the sentence, if some other judge had the case (due to death, illness, retirement, etc., of the trial judge), then a sentence modification might occur. The State, for this reason, desires to have a specific finding that defendant used a firearm and that sentencing is pursuant to K.S.A. 1979 Supp. 21-4618. Were that contingency the sole problem, the issue would be insufficient to consider the matter on a question reserved.

Inherent in this cross-appeal, however, is a much larger issue which transcends the State's immediate cause for concern.

Whether or not defendant used a firearm in the commission of the crime for which he was convicted is a matter for the trial court to determine at sentencing. *State v. Mullins,* 223 Kan. 798, 577 P.2d 51 (1978). It is the clear legislative intent of K.S.A. 1979 Supp. 21-4618 to divest the trial court of alternatives to sentencing when a firearm is used by a defendant in the commission of one of the crimes specified in the statute.

When making the determination mandated by K.S.A. 1979 Supp. 21-4618 relative to the use of a firearm, the trial court may not disregard the evidence in order to circumvent the operation of the statute. The purpose of the statute would be totally emasculated if a trial court could avoid its operation by simply concluding that a defendant did not use a firearm in the commission of a crime even though the evidence unequivocally established otherwise.

Did the trial court in this case disregard the evidence and err as a matter of law in ultimately refusing to find that the defendant personally used a firearm? Certainly there was ample evidence to support a finding that defendant personally shot and killed Larry Briggs. Had the instruction permitted the murder conviction only if the jury found that the defendant personally killed the deceased, the court would have had no alternative but to sentence pursuant to K.S.A. 1979 Supp. 21-4618. The trial judge does not serve as a thirteenth juror who is free to redetermine the facts as found by the jury of twelve. Under the first degree murder elements instruction in this case (previously set forth in relevant part), the conviction does not constitute a finding that defendant personally used the firearm. The trial court's rationale for not finding that defendant personally fired the fatal shots is based on logistical problems inherent in the manner in which the body was disposed of and speculation that assistance would have been required therein. The trial court heard the evidence. We, as the reviewing court, did not. Although it is an extremely close question, we cannot conclude, under the totality of the circumstances herein, that the trial court erred as a matter of law in refusing to find that defendant used a firearm.

On the appeal the judgment is affirmed. The cross-appeal of the State is not sustained.