No. 54,401

STATE OF KANSAS, *Appellee,* v. NATHAN HENRY CRISPIN, *Appellant.*

(671 P.2d 502)

Opinion filed October 21, 1983.

*Robert C. Claus,* of Independence, argued the cause and was on the brief for appellant.

*Jeffrey A. Chubb,* county attorney, argued the cause and *Robert T. Stephan,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

MILLER, J.: The defendant, Nathan Henry Crispin, was con-

victed of second-degree murder by jury trial in the district court of Montgomery County, Kansas. He appeals, raising some eight issues which we will state and discuss later in this opinion.

The body of Emmit Gary Shipp was discovered on January 25, 1981. It was partially concealed by brush and was found close to some railroad tracks a short distance from Caney, in Montgomery County, Kansas. The body was identified by means of a driver's license in a billfold found in the deceased's clothing. The victim had been badly beaten, particularly about the head and face, and he had been shot six times with a .38 caliber handgun. His ankles were bound together with rope. He was wearing only one shoe. A shoelace was found near the body.

On the following day, police officers in Alva, Oklahoma, about 200 miles west of the spot where the body was found, discovered an abandoned pickup truck behind a restaurant. The truck was bearing Colorado license plates. Upon running a routine check, they discovered that the truck was registered to Emmit Gary Shipp, and that the truck was sought in a homicide case in Kansas. Montgomery County officers were notified, and they proceeded to Alva, Oklahoma. Upon inspection of the truck, the officers observed false teeth and blood in the truck's bed. Also found in the pickup were five spent .38 caliber shells, a loaded shotgun, an unloaded Colt .45 caliber revolver, some loose .22 caliber shells, a tire iron, a piece of bloody rope, and a shoe with no lace. The bloody rope from the truck matched that found around Shipp's ankles. The shoe found in the truck appeared to be the mate of the one found on the body. The shoelace found with the body appeared to have come from the shoe found in the truck. The teeth found in the truck constituted a partial plate, which fit perfectly into the mouth of the deceased. The rope found in the pickup and the rope found tying the deceased's legs together were similar in construction, appearance and material.

An autopsy was performed, and the coroner testified at the trial that any of three gunshot wounds could have caused death. The coroner found powder burns on the body from four of the wounds and powder burns on the victim's clothing at the location of two other entry wounds. He estimated that these bullet wounds were inflicted at relatively close range. The victim's nose was broken and there were numerous contusions and abrasions about the head, back, right knee, and right lower leg.

On January 22, 1981, three days before the body was discovered, the defendant and a man named Louie Smith were seen at several places with Shipp, driving Shipp's truck, in Montgomery County. The three men had driven together from Colorado to Kansas, apparently on some sort of mission involving tracking down some people who had stolen money or drugs from Shipp. At a Phillips 66 station in Chetopa, an attendant saw defendant throw Shipp to the ground. Shipp temporarily took shelter in the women's restroom. After the three men left the service station, Chetopa police officers saw them in town. Later, they were again seen in Coffeyville by a waitress in a Sambo's restaurant. She saw the defendant elbow Shipp. Shipp was the only one of the three who appeared intoxicated. The waitress was the last State's witness who saw Shipp alive. Early on the morning of January 23, defendant and Smith were seen crossing the street toward the bus station in Alva, Oklahoma, where the truck was found. Two bloody duffle bags, containing Shipp's personal effects, were found in a trash dumpster about a mile from where the truck was discovered.

Louie Smith was never brought to trial; we are informed that he died in New York. Defendant Crispin was arrested in Idaho. Two convicts, Jim Leytham and John Hancock, who were confined in the same jail with defendant in Idaho, testified that the defendant admitted to each of them that he—Crispin—fired the shot which killed Emmit Gary Shipp. The defendant took the stand in his own defense. He admitted that he had a disagreement with Shipp, that he knocked him out, and that he loaded him into the bed of the pickup truck. He testified that he was driving, and that Louie Smith climbed through the window into the back of the pickup truck, struck Shipp several times with a heavy pipe wrench, eventually climbed back into the truck, and took out a .38 caliber revolver from the glove compartment. Defendant was driving; Smith was sitting in the passenger seat. According to defendant, Smith turned and fired several times toward Shipp, who was in the bed of the pickup. Smith then said, "Nathan, we are in this together. You got to shoot him too." Defendant testified that he then took the gun and fired one shot out of the rear window, without aiming at the body. Later, on cross-examination, he said, "I shot him one time after he was dead."

We now turn to defendant's claims of error. He first contends that the trial court erred in denying his pretrial motion for change of venue. It has long been our rule that one moving for a change of venue has the burden of establishing prejudice, and that specific facts and circumstances must be established which show that it will be practically impossible to obtain an impartial jury to try the case in the original county. *State v. Rainey,* 233 Kan. 13, 14, 660 P.2d 544 (1983); *State v. Salem,* 230 Kan. 341, 343, 634 P.2d 1109 (1981). Defendant's motion for change of venue was based primarily, if not altogether, upon the effect of pretrial publicity in the form of radio broadcasts and newspaper articles. On the whole, these appear to be simply objective reports of the facts. Defendant does not claim that the reports contain highly inflammatory statements. Defendant offered no testimony in support of his motion, and the only affidavit offered was that of a radio station news director, authenticating the transcripts of the broadcasts. No specific facts of the type necessary to sustain the motion were presented. Furthermore, the record of the voir dire demonstrates the absence of prejudice in the community. Only two jurors were challenged and excused for cause, and the entire voir dire took a little over four hours. Additionally, we note that none of the three principals involved—the defendant, the deceased, and Smith—were residents of the State of Kansas; none were well known in the area where the offense occurred and where the case was tried. Clearly, the trial judge did not err in denying defendant's motion for change of venue.

Defendant challenges the propriety of the trial court's action in admitting some fifteen photographs into evidence. The first six are views of the body concealed in the brush where it was found. They show that the legs were bound, that a shoe was missing, and that the body was partially hidden. Two of these photographs are close-ups of the victim's face, taken at the scene, and these clearly show that the victim had been severely beaten. The rest of the photographs were taken after the victim was removed from the scene. These are external views of the body and the head, taken from various angles, and showing the numerous wounds suffered. The record discloses that the coroner used these photographs extensively in illustrating his testimony. Defendant relies primarily upon *State v. Boyd,* 216 Kan. 373, 532 P.2d 1064 (1975). In that case, the autopsy photographs were not

external views, but views of the body after it was split open, exposing the various internal organs. The state of the victim's body in this case, however, had not been changed significantly when the photographs were taken.

As we noted in *State v. Crump,* 232 Kan. 265, 271, 654 P.2d 922 (1982):

"We have faced this issue many times and have often said that so long as the photographs are relevant and help the jury to better understand the testimony and other evidence in the case, they are not inadmissible simply because they portray the macabre result of a violent and heinous crime. *State v. Johnson,* 231 Kan. 151, 643 P.2d 146 (1982). The photographs were utilized by the pathologist to explain his testimony and were also relevant to show, by the extent of the damage, the wilful and purposeful nature of the defendant's acts and the violent nature of the victims' deaths. The admission of such evidence is discretionary with the trial court and no abuse of that discretion has been shown."

Defendant suggests that the photographs were repetitious; however, there were numerous injuries, the photographs showed different views of the deceased, and the pathologist referred extensively to the photographs during his testimony. Under the circumstances, the trial court did not abuse its discretion in admitting the photographic exhibits.

Defendant contends that the trial court erred in permitting the prosecutor, during cross-examination, to question the defendant about his failure to take a polygraph test. The general rule, of course, is that in the absence of a stipulation between the parties, the results of a polygraph test are inadmissible. *State v. Crossman,* 229 Kan. 384, 624 P.2d 461 (1981). No results were offered, however, since the defendant did not take a polygraph test. He introduced the subject of polygraph examinations during his direct testimony, stating in substance that at various times he told Deputy Glen Sutton and Deputy Jack Daniels that he would take a polygraph test. Once the subject was raised by defendant during his direct examination, it was legitimately an area for cross-examination. *State v. Ramsey,* 228 Kan. 127, 129, 612 P.2d 603 (1980). As we said in *State v. Dargatz,* 228 Kan. 322, 331, 614 P.2d 430 (1980),

"[O]nce an issue is raised on direct, the 'door is open,' and 'the cross-examination may go into any phase thereof and may extend to the entire subject matter; it is not restricted to the identical details developed on direct examination or the specific facts testified to in chief.'"

And see *State v. Bagby,* 231 Kan. 176, 642 P.2d 993 (1982).

We further note that no contemporaneous objection to the cross-examination was lodged at trial, as is required by K.S.A. 60-404. We find no error in the challenged cross-examination.

Defendant contends that the trial court erred in failing to instruct the jury on involuntary manslaughter. Defendant was charged with murder in the first degree, and the trial court instructed the jury on murder in the first and second degrees and voluntary manslaughter. Although requested to do so by the defendant, the trial court did not instruct the jury on involuntary manslaughter.

K.S.A. 21-3107(3), since amended, imposes a duty upon the trial court to instruct the jury as to all lesser crimes of which the accused might be found guilty under the charges contained in the information and upon the evidence adduced. This duty, we have frequently noted, arises only when there is evidence upon which a defendant might reasonably be convicted of the lesser charge. See *State v. Chears,* 231 Kan. 161, 165, 643 P.2d 154 (1982), and cases there cited. Further, when considering the refusal of a trial court to give instructions requested by the defendant, an appellate court must consider the evidence supporting those instructions in the light most favorable to the defendant. *State v. Myers,* 233 Kan. 611, 616, 664 P.2d 834 (1983); *State v. Farmer,* 212 Kan. 163, 510 P.2d 180 (1973).

The issue then is whether the evidence supports a conviction of involuntary manslaughter. The offense is defined by K.S.A. 1982 Supp. 21-3404:

"Involuntary manslaughter is the unlawful killing of a human being, without malice, which is done unintentionally in the wanton commission of an unlawful act not amounting to felony, or in the commission of a lawful act in an unlawful or wanton manner.

". . . As used in this section, an 'unlawful act' is any act which is prohibited by a statute of the United States or the state of Kansas or an ordinance of any city within the state, which statute or ordinance is enacted for the protection of human life or safety."

As we noted in *State v. Staab,* 230 Kan. 329, 340, 635 P.2d 257 (1981):

"This court has held that even though the *shooting* is intentional, only the *killing* must be unintentional to fall within the definition of involuntary manslaughter. *State v. Gregory,* 218 Kan. [180] at 184 [542 P.2d 1051 (1975)]; *State v. Childers,* 217 Kan. 410, 416, 536 P.2d 1349 (1975). But even if the killing is unintentional there must be evidence it was done either 1) in a wanton manner during the

commission of a misdemeanor, or 2) during the commission of a lawful act in an unlawful or wanton manner."

Defendant testified that his part in the killing of Shipp was unintentional. He admitted knocking him out and putting him in the back of the pickup truck, and then later firing a shot through the sliding rear window without taking particular aim. Thus, from the defendant's testimony, there was evidence that he did not intend to kill Shipp when he fired the shot. There is no evidence, however, that the shot was fired in a wanton manner during the commission of a misdemeanor, or in the alternative, that it was fired during the commission of a lawful act in an unlawful or wanton manner.

In *State v. Seelke,* 221 Kan. 672, 561 P.2d 869 (1977), we discussed the necessity for giving an instruction on involuntary manslaughter in cases in which a higher degree of homicide is charged. Though the defendant in *Seelke* did not claim to be intoxicated at the time the offense was committed, we discussed evidence of intoxication in homicide cases and said:

"[W]hen a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind. In *State v. Rumble,* 81 Kan. 16, 105 Pac. 1, this court held that drunkenness may reduce a homicide from murder to manslaughter if it is so extreme as to prevent the existence of an intention to kill." 221 Kan. at 678.

In the case at hand, while the defendant made a general claim of intoxication, he did not claim that he was so intoxicated that he did not know what he was doing. He testified in detail as to his acts and those of the victim and Smith immediately before, during and after the commission of the homicide. The defendant's own evidence negates any claim that his intoxication was so extreme that he could not form an intent to kill. In fact, the defendant testified that a short time before the shooting, he struck the defendant, knocked him out, loaded him into the bed of the pickup truck, and drove off. He remembered his intentions at that time clearly enough to testify that he did not intend to kill the deceased. Under all of the circumstances of this case, we conclude that the trial court was correct in refusing to instruct the jury on involuntary manslaughter.

Defendant also contends that the trial court committed error in

failing to instruct the jury on compulsion as a defense. K.S.A. 21-3209 provides in applicable part that:

"A person is not guilty of a crime other than murder or voluntary manslaughter by reason of conduct which he performs under the compulsion or threat of the imminent infliction of death or great bodily harm, if he reasonably believes that death or great bodily harm will be inflicted upon him . . . if he does not perform such conduct."

This defense was not available to the defendant for two reasons. First, by the explicit terms of the statute, the defense of compulsion is not available on charges of murder or voluntary manslaughter. These were the only charges which were submitted to the jury. Second, the compulsion must be present, imminent, and impending; it must be continuous; and there must be no reasonable opportunity to escape from the compulsion without committing the crime. *State v. Myers*, 233 Kan. 611. Here, the evidence disclosed no implicit or implied threat of imminent bodily harm. When Smith handed the defendant the loaded gun, defendant could have captured Smith, thrown the gun out the window, or refused to fire the weapon at Shipp. The trial court did not err in refusing the requested instruction.

Defendant contends that the trial court erred in sentencing him under the habitual criminal act for three reasons: (1) his prior felony conviction in California was for driving while intoxicated, a felony under California law but not under Kansas law; (2) there was insufficient documentation of the California conviction, and (3) the trial court abused its discretion in imposing the sentence of thirty years to life.

K.S.A. 21-4504, the Kansas Habitual Criminal Act, provides in substance that the act may be applied once the trial court finds from competent evidence the fact of former convictions for felony committed in or out of this state. There is nothing in the act which requires that the foreign conviction be for an offense which is a felony under the laws of this state. In *State v. Crowe*, 207 Kan. 473, 477, 486 P.2d 503 (1971), we considered the same point involving a Texas conviction and we held that it was sufficient that the offense was a felony as defined by the laws of the other state or jurisdiction. Defendant's conviction in California was under a section of the California code making it a felony for any person, while under the influence of intoxicating liquor, or intoxicating liquor and any drug, to drive a vehicle and while so driving to do any act or neglect any duty imposed by law,

which act or neglect proximately causes death or bodily injuries to any other person. While we have no similar Kansas statute, the offense is clearly a felony under California law and a conviction thereunder is sufficient to support the invocation of the Kansas Habitual Criminal Act.

We turn next to the records upon which the trial court based its finding that defendant had a former felony conviction in California. The first is a certified and authenticated copy of an order of the Superior Court of Placer County, California, suspending the imposition of sentence for a period of three years and placing the defendant on probation for that period of time. The order recites that the defendant, on October 25, 1973, entered a plea of nolo contendere to a violation of California Vehicle Code Section 23101, "driving under influence of intoxicating liquor causing bodily injury, a felony, as charged in the Information filed herein . . . ." The defendant, in writing, acknowledged a copy of the court's order. Also furnished to the trial court was a rap sheet provided by the California Bureau of Identification, disclosing the California felony conviction. A photograph of the defendant and his fingerprint card and a certified and authenticated copy of the arrest disposition record maintained by the Sheriff of Placer County, California, reflected disposition of the felony charge of driving under the influence of intoxicating liquor causing bodily injury. The statute merely requires "competent evidence." The certified and authenticated copies of these records constituted competent evidence of the former conviction. *State v. Voiles,* 226 Kan. 469, 601 P.2d 1121 (1979).

We turn now to defendant's contention that the trial court erred in imposing the maximum term allowed by law. Defendant points to a number of facts which he contends mandate a lighter sentence. These include evidence that the defendant has had drug problems and had been drinking at the time Shipp was murdered; that when defendant was six years old, his father shot his mother and committed suicide in defendant's presence; that defendant has potential to contribute to society; and that Shipp may have brought this on himself. The facts disclose an exceptionally brutal homicide in which the victim was beaten with fists and a large wrench or other implement, bound hand and foot, and shot six times at close range. There was no evidence of significant provocation and no evidence that the victim induced

or facilitated his own death. While the trial judge did not explicitly state on the record that he considered each of the factors enumerated in K.S.A. 21-4606, he did indicate that he was considering many of those factors, and others are wholly unsupported or are inapplicable. The better practice is for a trial judge to make a detailed record of the facts and factors considered in imposing sentence. *State v. Coberly,* 233 Kan. 100, 111, 661 P.2d 383 (1983). Also in *Coberly* at page 110, we said:

"It is a long standing rule in Kansas that this court will not disturb a sentence imposed by a trial court on the ground it is excessive, provided it is within the limits prescribed by law and within the realm of discretion on the part of the trial court, and the sentence is not the result of partiality, prejudice, oppression or corrupt motive. *State v. Words,* 226 Kan. 59, 67, 596 P.2d 129 (1979); *State v. Buckner,* 223 Kan. 138, 150, 574 P.2d 918 (1977). It is necessary the complaining party show vindictive or retaliatory motives, or that judicial discretion was abused, to successfully attack the penalty imposed. *State v. Words,* 226 Kan. at 67; *State v. Eaton,* 213 Kan. 86, 89, 515 P.2d 807 (1973)."

The sentence is within the limits prescribed by statute, and there is nothing in the record to indicate partiality, prejudice, oppression, corrupt motive, vindictiveness, or abuse of judicial discretion. We find no error.

Defendant contends that the trial court erred in allowing into evidence parts of the testimony of John Hancock. As we stated earlier, John Hancock was a convict with whom the defendant conversed while being held in Boise, Idaho, for Kansas authorities. At trial, Hancock acknowledged that he had spent thirty-six years behind bars. He had been transferred to the Idaho facility because he was scheduled to testify against other convicts who staged a prison riot. The bulk of his objectionable testimony related to his abhorrence of violent crimes, his attempts to stop prison riots and his great dislike for unnecessary violence. This objectionable testimony included some details of the Idaho State Correctional Institution riot that Hancock said he tried to stop. Hancock stated that the riot was not justified, and that he was going to testify against those who started it. He stated that his time in prison goes back to the time of the Loeb and Leopold case, which he described briefly. He said that that case now would not even make the newspapers because of today's widespread violence. According to Hancock, in the old days a robber did everything he could to prevent anybody from getting hurt when he went out on a stickup. The violent young offenders

continue their violence when they get into the penitentiaries, which is a disservice to the eighty to ninety percent of the inmates who are trying to get along and do their time. In addition, he gave the details of his conversations with the defendant. At first the defendant told Hancock that he was blaming most of this on the other fellow (Smith). Later, he was taking credit for beating the victim with an iron bar and shooting him.

The Idaho prison riots, the Loeb and Leopold case, the violence of certain prisoners, and the witness's ranting about the way prison life has degenerated, are certainly collateral to the issue in this case. The statements were not relevant to the issue of whether or not the defendant murdered Shipp; their only significance was to establish Hancock's motive for testifying in the case, and the statements went well beyond a simple statement of that motive. We hold that the trial court abused its discretion in allowing the witness to pursue this tirade.

Having determined that this was error, was it harmless error? For trial error to be harmless, an appellate court must be able to declare beyond a reasonable doubt that the error did not change the outcome of the trial. *State v. Norman*, 232 Kan. 102, 108, 652 P.2d 683 (1982). In addition to Hancock's testimony about defendant's statements to him, another inmate, Jim Leytham, testified fully about defendant's admission of the killing while defendant was awaiting extradition in Idaho. Hancock's statements must be placed in the context of a lengthy jury trial in which much strong evidence was introduced tending to convict the defendant. The State's case was overwhelming. We therefore conclude that the admission of the irrelevant portions of Hancock's testimony was harmless error.

Finally, defendant contends that the trial court erred in denying defendant's motion for new trial. All of the issues raised in this appeal, with the exception of that concerning the polygraph test, were relied upon in defendant's motion. Since we have determined each of those issues adversely to him, we hold that the trial court properly overruled his motion for a new trial.

The judgment is affirmed.

SCHROEDER, C.J., concurs in the result.